## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| REUTEN ASSOCIATES, LP, on behalf of itself and prospective residents, JOHN and JANE DOES 1-10 <br><br> Plaintiff, <br><br> v. <br><br> BOROUGH OF CLOSTER and ZONING BOARD OF ADJUSTMENT OF THE BOROUGH OF CLOSTER, and JOSEPH BIANCO, in his individual capacity and his official capacity as Chairman of the Zoning Board of Adjustment of the Borough of Closter <br><br> Defendants. | Civil Action No. 2:24-cv-6615 <br><br> **COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff, Reuten Associates, LP (the "**Plaintiff**") an applicant for an assisted living, memory care, and congregate care residential real estate project on certain property it owns commonly known as 231-239 Herbert Avenue, in the borough of Closter, County of Bergen and State of New Jersey, having its principal place of business located at 239 Herbert Avenue, Closter, New Jersey 07624 by way of complaint hereby says:

### I.    THE PARTIES

1.    Plaintiff is a limited partnership with offices at 239 Herbert Avenue, Closter, New Jersey 07624.

2.    Plaintiff is a developer proposing to construct an assisted living, congregate care, and memory care, facility to care for the aging, infirm, and disabled who need assistance with day-today activities including but not limited to eating, bathing, and taking their medication (the "**Project**").

3.    The residents of Plaintiff's proposed Facility include persons with disabilities and/or handicaps as covered by the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3603 ("**FHAA**");

1

(ii) the Americans with Disabilities Act, 42 U.S.C. § 12132 (the "**ADA**"); and (iii) the Rehabilitation Act, 29 U.S.C. § 791 (the "**RA**"), as they have mental or physical impairments that substantially limit one or more major life activities.

4. Pursuant to the Fair Housing Amendments Act, 42 U.S.C. §3601, et seq. Plaintiff also represents the interests of John and Jane Does 1-10, who are disabled or handicapped individuals requiring congregate care, memory care, and/or assisted living services that intend to reside in the Facility when it is built. Plaintiff is permitted to act on behalf of John and Jane Does 1-10.

5. The Borough of Closter ("**Defendant Borough**" or "**Borough**") is a municipal corporation with an address of 295 Closter Dock Road, Closter, New Jersey 07624. Under New Jersey's Municipal Land Use Law, Defendant Borough has the power to legislate zoning of land within the Borough.

6. The Closter Zoning Board of Adjustment ("**Defendant Board**" or "**Board**") is a municipal body with an address of 295 Closter Dock Road, Closter, New Jersey 07624. Defendant Board is a duly constituted land use board of the Borough charged with, amongst other things, reviewing applications for development that require site plan approval and variance relief pursuant to N.J.S.A 40:55D-70(d).

7. At all times relevant hereto, Joseph Bianco ("**Bianco**" or "**Chairman**")(together with "**Defendant Board**", known as the "**ZBA Defendants**") has been and is the Chairman of the Closter Zoning Board of Adjustment, with an address of 295 Closter Dock Road, Closter, New Jersey 07624, but is named in this complaint in both his personal capacity and official capacity.

## II.     JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over the federal claims alleged in this Complaint pursuant to (i) 28 U.S.C. § 1331, in that the claims asserted herein are civil claims

arising under the FHAA, the ADA, and the RA, and (ii) 42 U.S.C. § 1983 for claims alleging violations of the equal protection clause and due process clause of the Fourteenth Amendment of the United States Constitution.

9.      This Court has supplemental jurisdiction over the state claims alleged in this Complaint pursuant to 28 U.S.C. § 1367, in that the claims alleged are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

10.     Venue is proper under: (i) 28 U.S.C. § 1391(b)(1) because the Borough is a body politic within the District of New Jersey and the Board is located and operates within the District of New Jersey; and (ii) 28 U.S.C. § 1391(b)(2) because the events or omissions giving rise to the claims set forth herein occurred in the District of New Jersey and all of the real property that is the subject of the action is situated in the District of New Jersey.

### III.   STATEMENT OF FACTS

**A.  General Background Facts**

11.     This lawsuit evolves out of a failed Zoning Board of Adjustment application for site plan approval and variance relief, including a use variance for an inherently beneficial use (age restricted assisted living, memory care and congregate care services) with an inclusionary affordable housing component and the historical long-standing policy and practice of discrimination against the aged, infirm, disabled and poor by the Defendants, that has permeated through every layer of its government and has manifested itself in discriminatory acts and omissions by its Governing Body, elected officials, appointed officials, employees and agents.

12.     The Plaintiff is the owner and applicant of property commonly known as 231-239 Herbert Avenue, Closter, New Jersey (the "**Property**"), which is proposed to be developed for what is commonly known as an assisted living, memory care, and congregate care facility,

providing congregate care services and housing for the frail elderly, and disabled.

13.    The discriminatory intent and actions of Defendant Borough through various individuals and boards, especially that of Defendant Board, led by Defendant Bianco is glaring and offensive, and squarely violates federal law and any sense of common decency.

14.    This discrimination has sabotaged the Application and led to harmful and detrimental results for the frail elderly, poor and the residents of Closter, who were denied the opportunity for lower taxes  (as the proposed Project would generate almost ten times the taxes currently paid on the properties in question, without adding a single child to the school system) and reduced development (the Project would produce more than double the affordable housing units than the Borough had planned for the site—thereby reducing the need to construct  well over a hundred other market rate units elsewhere ).

15.    The discriminatory intent has been long-lasting, spanning at least several decades and has manifested itself in the following manner: (i) a municipal zoning code that not only fails to permit, but actually prohibits assisted living and congregate care facilities outright, and goes further to impose prohibitive conditions for such facilities, just in case a use variance were ever to be approved, that are cost generative and inhibit the prospect of development (such as a requirement that such facilities maintain on-site 24/7 ambulance/paramedic equipment and staff, (ironically, at the same time that Defendant Borough provides free 911/EMT/Paramedic services to other assisted living, memory care, and/or congregate care facilities outside its borders that do not provide the required 24/7 ambulance service)) and (ii) a completely unrealistic floor area ratio restriction that is so onerous, that it forestalls the possibility of the development of such a facility.

16.    The discriminatory intent of Defendant Borough first manifested itself  against the Plaintiff, when it notified the Borough Council in the fall of 2018 of its desire to construct an age restricted assisted living, memory care, and congregate care facility on its 6+ acre site located at

231-239 Herbert Avenue and requested consideration for zoning changes to accommodate the same through its affordable housing plan and then later through the redevelopment process.

17.     The Borough through its then attorney advised Plaintiff that the affordable housing plan was too far along to be altered and slyly misrepresented that the Borough was interested in a possible redevelopment process to provide permissive zoning for the Property, as a means to discourage Plaintiff from intervening in the Borough's then-pending affordable housing litigation so it could ultimately prevent the Project and discriminate against the frail elderly.

18.     Consequently, Plaintiff abandoned its intent to intervene in the Borough's affordable housing litigation, to work with the Borough on the redevelopment of the Property.

19.     Unbeknownst to the Plaintiff, the Borough's expressed interest with respect to the redevelopment of the Property was disingenuous.

20.     While it was exploring the possibility of redevelopment through regular communications and meetings between the Borough's Attorney, Administrator, Mayor, and Planner, the Borough was secretly scheming to hurriedly perform a re-examination of its master plan, which disingenuously concluded, contrary to all common knowledge, common sense, and facts known to be true, that there somehow and for some unexplained reason, existed no demand or available property for senior housing within the Borough.

21.     More specifically, during the exact same period that the Borough Mayor, Attorney, Planner and Administrator were meeting with the Plaintiff and its professionals about its desires to develop age restricted assisted living, the very same Planner drafted a new re-examination report and then the very same Mayor, Administrator, and Attorney presided over the process to introduce and adopt the same, without any notification to the Plaintiff of such report, with discriminatory intent.

22.     During this period of time, while feigning interest in the Project and failing to

disclose its true intentions to stack the re-examination report against the frail elderly, the Borough was stalling the redevelopment process and suggested that the Plaintiff, at great monetary expense, develop its proposal and then present it at a public council meeting, which presentation the Borough then delayed until after its secret re-examination report was finally adopted.

23.     Ultimately, the Governing body adopted the re-examination report a few days before the Application's presentation to the Borough Council on October 7, 2019.

24.     The discriminatory and deceitful intent of Defendants' actions is reinforced by the fact that the 2019 re-examination report failed to cite a single fact or statistic in support of its baseless conclusion that there was a lack of demand for senior housing.

25.     In reality, Defendants' unsupported conclusion ignored the fact that demand for senior housing was increasing, as confirmed by the US census and that the area within which Closter is located has an insufficient supply of senior housing.

26.     This demand is amplified by the fact that approximately 10,000 "Baby Boomers" turn age 65 every year.

27.     The 2019 re-examination report also falsely claimed that there were no available properties to accommodate senior housing and ignored the fact that a substantial property owner within the Borough was interested in senior type housing, as well as the fact that the Property could accommodate the proposed use.

28.     Upon information and belief, Defendant Bianco (who was then and now continues to be the Chairman of Defendant Board) had numerous conversations and communications with the then Borough Council Members, Planner, and Attorney, regarding the Plaintiff's intended use of the Property, as well as the 2019 re-examination report and the Plaintiff's request for permissible zoning by way of redevelopment, with the intent to obstruct the proposed Project.

29.     Defendant Bianco appeared and spoke out against the redevelopment of the Property

for the Project in his official capacity as Chairman of the Zoning at the October 7, 2019 Council meeting.

30.    In so doing, Chairman Bianco publicly encouraged Plaintiff to file its application before the Defendant Board where he ultimately exacted control over the Application and pursued the Defendants' discriminatory policies against Plaintiff, the aged, infirm, and disabled.

31.    When Plaintiff's counsel expressed concern with respect to the expense of a Zoning Board of Adjustment application, Defendant Bianco advised that the Plaintiff could apply for the use variance bifurcated from the site plan as a way to save money on design costs, before the Plaintiff was aware if the use variance was granted.

32.    Thereafter, the Borough advised that it was not interested in engaging in the redevelopment process (despite the fact that the Property was a 60+ year old industrial park and the Borough's Master Plan had the stated goal of reducing reduce industrially zoned property).

33.    Thereafter, Plaintiff, pursuant to the Municipal Land Use Law, N.J.S.A. 40:55D-1, et seq., filed an application for preliminary and final site plan approval along with various "D" variance relief including, but not limited to D1 "use" variance relief, D6 height variance relief, and D4 Floor Area Ratio Relief, along with various "C" variance relief and design standard relief, due to the fact that all such standards were drafted to regulate industrial uses and were inappropriate.

34.     After filing the Application, in what could only be characterized as a circus, the ZBA Defendants as well as the Board's professionals (upon the Chairman's direction; often times reluctantly) clearly and unequivocally engaged in discriminatory and improper conduct that ultimately rendered the Board's decision arbitrary, capricious, discriminatory, and illegal.

35.    Throughout almost 30 hearings, the Defendant Bianco exhibited extreme bias towards Plaintiff and the Application, clearly having "made up [his] mind" prior to the conclusion of the Application and likely before it was even filed, by routinely interrupting the Plaintiff's

7

presentation, often times over Plaintiff's objection and from time-to-time even against the Board

Attorney's advice and expressing unsolicited opinions and conclusions for which there were no

supportive facts before the Board and were often based upon considerations that the ZBA

Defendants were precluded from considering, and were outright falsehoods or half-truths that

unduly and improperly influenced the Board, such as: (i) assisted living facilities invite crime; (ii)

Asians will not use it; (iii) the rich will not use it; (iv) Closter's  residents can't afford to live there;

(v) the proposed Facility is too big, which had no factual support in the record or ; and (vi) the

proposed Facility will be the biggest building in the Borough. These unfair statements, which had

no factual support in the record or where outright false, where nonetheless always prejudicial and

they happened repeatedly, to the point where no reasonable Board member could differentiate

between the Chairman's words and actual witness testimony by the time they were called to

deliberate.

36.     More evidence of improper influence of the Board and ultimate prejudice sustained

by the Plaintiff were: (i) the ZBA Defendants actually invited objectors or potential objectors to

participate in the application process; (ii) the ZBA Defendants also intentionally engaged in time

consuming activities just to increase the Plaintiff's expenses and delay the Application; (iii)

Defendant Bianco often intentionally mischaracterized witness testimony and/or the nature of the

Application in an apparent attempt to pretextually create an issue of lack of credibility (that

manifested itself in resolution, but are all false); (iv) Defendant Bianco continuously and

intentionally asked misleading questions loaded with false facts and information that was not in

evidence as a way to create an adverse record and align fellow Board members against the

Application, even after repeated objections; and (v) the Board Attorney repeatedly overstepped his

role as a (purportedly) neutral party, effectively functioning as another board member.  All

allegations are factually supported in greater detail in this Complaint.

37.     The forgoing actions by the ZBA Defendants are nothing less than concerted efforts to discriminate against the Plaintiff's Project due to the goals of providing senior and aged assisted living in the Borough, and such behavior as set forth below shocks the conscience.

38.     These actions all resulted in an unfair hearing to Plaintiff, that resulted in an arbitrary and capricious decision.

39.     In yet another example of discriminatory intent and bias, throughout 27 hearings, there was no formal objector, but the Chairman of Defendant Board engaged in consistent, nonstop cross-examination and badgering of the Plaintiff's witnesses, in excess of what an aggressive objector's attorney would do, never mind as a neutral factfinder should act.

40.     It is crystal clear that the Defendants had improperly made up their mind on the Application and did not give the Plaintiff a fair opportunity to be heard.

41.     Ultimately, the discriminatory intent and bias of the ZBA Defendants manifested itself in a resolution that is nothing less than  a mockery of the MLUL, as despite the fact that it is over 75 pages in length  it (i) does not accurately reflect the testimony and evidence presented at the hearings, (ii) omits key material testimony and evidence put before the board; (iii) fails to address improper and biased behavior, and bath faith of Defendants; (iv) does not discuss the Board's relentless focus on irrelevant issues outside the scope of  its lawful considerations (which ultimately were the true factors upon which Defendant Board's denial was based); (iv) fails to cite key testimony from the Board's own professionals that corroborated and bolstered the Plaintiff's professionals' testimony; (v) does not discuss the multitude of objections levied by Plaintiff's counsel; and (vi) mischaracterizes the Plaintiff's witness testimony and takes it out of context, to falsely and pretextually raise non-existent issues of credibility, in an attempt to discount credible and uncontroverted evidence.

42.     However, what the resolution does use its verbosity for is: (i) taking testimony out

of context in order to pretextually challenge credibility of witnesses and (ii) including findings of fact that were never put before the Board and are not in the record; in order to attempt to establish possible legitimate reasons for its denial in an attempt to hide the Board's blatant bad faith.

43.     The Board improperly considered factors it should not have, over their own attorney's instruction and the resolution inaccurately misrepresent the same.

44.     The board decision was based upon an inaccurate and/or incomplete representation of the applicable law by its attorney, as the explanation of law did not accurately represent the holdings and law set forth by the Courts in <u>Grasso v. Spring Lake Heights</u>, 375 N.J. Super. 41 (App.Div. 2004) & <u>Jacoby v. Englewood Cliffs Bd. Of Adj.</u>, 442 N.J. Super. 450 (App. Div. 2015).

45.     The Board's decision improperly denied D1 variance relief under the <u>Sica</u> analysis (<u>Sica v. Twp. of Wall Bd. of Adj.</u>, 127 N.J. 152 (1992)) as it did not properly engage in the regular four-step process, thereby not only rendering its decision arbitrary and capricious, but violating the Plaintiff's constitutional right to Due Process of Law. It further violated Plaintiff's rights by improperly considering the law and various factors only applicable to the D6 height variance and D4 Floor Area Ratio variance, which needed to be considered separately.

46.     For the reasons set forth in this Complaint, Defendants actions violated federal and State law including, but not limited to the (i) FHAA; (ii) ADA; (iii) "RA; (iv) the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution; (v) the Due Process Clause of the Fourteenth Amendment of the United States Constitution ("**Constitution**"); (vi) Municipal Land Use Law, <u>N.J.S.A.</u> 40:55D-1, et seq. ("**MLUL**"); (vii) the Fair Housing Act, <u>N.J.S.A.</u> 52:27D-301, et seq. ("**Fair Housing Act**").

47.     All of these facts and the ones below not only show that the Board's decision was arbitrary and capricious, but they also evidence a pattern and practice of discriminatory practices, policies and procedures that are shocking to the conscience.

B. **The Borough Code and its Violations of the US Constitution, Federal  and State Law**

I.    *The Zoning Regulations Are Discriminatory*

48.    The development and regulation of real property in the State of New Jersey is governed by the MLUL. Under the MLUL, municipalities have the power to adopt development regulations that govern the use of land within the boundaries thereof. A municipality is obligated to exercise its zoning power in a non-discriminatory manner and in a way that creates a realistic opportunity for the development of its fair share of the regional need for low and moderate cost housing.

49.    In 1981, the Borough enacted a Municipal Master Plan, which has been reexamined, but not updated since its adoption.

50.    The Master Plan identifies certain goals and objectives to guide future growth, development and redevelopment in the Borough.

51.    Among the Master Plan's goals, which remain in full force today are to: (i) reduce the amount of industrially zoned land in the community and to more adequately provide additional lands for business and professional office use and (ii) promote the continued maintenance and rehabilitation of the Borough's housing stock and supporting facilitates.

52.    The Master Plan further determined, in its "Summary Findings and Conclusions" section, that the Borough should provide, through planning, a greater variety of housing choices for its residents, including the elderly.  This determination remains unchanged through today.

53.    The Borough has performed multiple re-examinations of its Master Plan since its adoption, which have noted that industrial uses in the Borough should be reduced, and senior housing options need to be provided.

54.    The re-examination reports of 2002 and 2008 indicated that the lack of senior housing was a major problem in the Borough and that industrial uses should be eliminated and/or

reduced.

55.     Between the re-examination reports of 2002 and 2008 and Plaintiff's Application, there were no senior housing or assisted living, congregate care, and memory care units constructed within the Borough.

56.     Contemporaneously and secretly with Plaintiff's proposal to redevelop the Property in 2018, the Borough performed its 2019 re-examination report, which suspiciously and inexplicably removed senior housing as a proposed goal due to lack of demand and available land. The Borough's reasoning was pretextual and unsupported by any factors whatsoever, as a means to prevent Plaintiff from constructing an assisted living, memory care, and congregate care facility at the Property and to discriminate against the aged, disabled and/or handicapped residents of the proposed Facility.

57.     Additionally, more than 40 years after the Master Plan was enacted, the Zoning Regulations of the Borough of Closter, Ch. 200 (the "**Code**") still does not allow and in fact prohibits assisted living, memory care, and congregate care facilities to be developed as a permitted or a conditional use in any of its zones and in fact prohibits them and seeks to impose unreasonable obligations and restrictions to further inhibit such uses in the event an applicant, such as Plaintiff, secures a D1 use variance.

58.     More specifically, under the Code, all Borough lands are assigned a zoning district, and no building or structure shall be erected or constructed, unless done in conformity with the Code.

59.     Under the Code all uses not specifically permitted by zone or by State or Federal law are prohibited.  As such, since assisted living is not permitted anywhere, it is prohibited everywhere and, thus, the Code is discriminatory against the Aged and Disabled on its face.

60.     The facially discriminatory Code expressly precludes the development of assisted

living, memory care, and other congregate care facilities anywhere within the Borough in violation of the Equal Protection Clause of the Fourteenth Amendment of the Constitution and 42 U.S.C. §1983.

61.     By enacting and enforcing the Code, Defendants have unlawfully discriminated against the disabled and handicapped, many of whom and not independent and must live in a congregate care facility due to their disabilities.

62.     The FHAA, ADA, and RA prohibit municipalities from imposing zoning conditions that have the effect of excluding congregate care living arrangements from municipalities.

63.     Notwithstanding this well-settled federal Law, the Borough's Zoning Code impermissibly precludes the development of congregate care facilities within any of the Borough's zoning districts. Under the Code's express terms, therefore, handicapped individuals requiring congregate care, including John and Jane Does 1-10, are restricted from living in the Borough. The Code does not impose such restrictions on nonhandicapped individuals.

64.     The lack of congregate care housing stands in stark contrast to the abundance of housing options available for individuals that are not frail, inform or otherwise require congregate care.

65.     Notably, the Borough's discrimination against the aged/infirm/handicapped has persisted despite Plaintiff's efforts to obtain a reasonable accommodation from the Code.

66.     Unfortunately, the Board was biased and/or unfairly unobjective in its consideration of the Application. Led by its Chairperson Bianco, the Board repeatedly exhibited hostile behavior towards the Plaintiff and had clearly predetermined to "deny" the Application even before the first hearing, which influenced the Board and was detrimental and prejudicial to the Plaintiff.

II.     *Ordinance §173-52F is Unconstitutional, Illegal, and Void as a Matter of Law*

67.     Chapter 170 of the Borough's Municipal Code addresses the subdivision of land and site plan review and identifies certain design and site standards for site plan approval.

68.     §173-52F of the Borough's municipal code imposes a design/site standard requirement that is cost generative and prohibitive, such as that the proposed Facility, because it provides assisted living, memory care, and congregate care services, maintain on-site 24/7 ambulance/paramedic equipment and staff ("**Ambulance Ordinance**").

69.     More specifically, the Ambulance Ordinance provides that Plaintiff shall provide "onsite 24/7 ambulance care upon senior citizen housing, nursing home, assisted living facility, or substantially similar site designed to house at least 25 residents" and provide "EMT-staffed ambulance and ambulance service (24 hours per day, seven days per week) on that site." Further, that "[t]he on-site ambulance service shall be operated and housed in a structure and parking approved by the Closter Planning Board."

70.     The Ambulance Ordinance is illegal and unenforceable as it violates New Jersey and federal law, leading to an actionable claim under 42 USC §1983 and HUD (affordable housing regulations), and the MLUL.

71.     The Ambulance Ordinance, amongst other things: (i) treats the aged and infirm, disparately from the nonaged and/or disabled in violation of the MLUL's uniformity provisions of N.J.S.A. 40A:55D-62(a) and the Equal Protection Clause of the Fourteenth Amendment of the Constitution; (ii) is cost generative to the developer and/or operator of the Facility, in violation of the federal and State affordable housing regulations and the Mount Laurel doctrine because it serves as an obstacle for the Borough providing a realistic opportunity for the development of low and moderate income housing consistent with the Mount Laurel decisions. Bi-Cnty. Dev. Of Clinton,

Inc. v. Borough of High Bridge, 174 N.J. 301 (2002), Toll Bros. v. Twp. of West Windsor, 173 N.J. 502 (2002); Mount Laurel I, 67 N.J. at 174, 336 A.2d 713; Mount Laurel II, 92 N.J. 158, 456 A.2d 390 (1983).; (iii) violates the enabling statute that permits municipalities to establish site standards, N.J.S.A. 40A:55D-41 because it establishes design standards for the provision of ambulance/EMT services which is not one of the permissible categories that a municipality can regulate through site design standards; and is preempted by State law.

72.     In or about December of 2022, Plaintiff put the Defendants on notice as to the illegality of the Ambulance Ordinance, advising them that the Ambulance Ordinance was (i) preempted by the New Jersey Department of Health licensure regulations; (ii) violated the MLUL, specifically the uniformity provisions of N.J.S.A. 40A:55D-62(a), which is evidence of an equal protection violation; (iii) violative of the HUD affordable housing regulations because it is cost generative legislation, to the detriment of Plaintiff as the operator of the Facility; and (iv) violated New Jersey statutes, regarding the establishment of site standards.

73.     The Defendants ignored the notice and continued to thumb their noses at the law, by not rescinding the invalid ordinance and then enforcing the Ambulance Ordinance, in violation of New Jersey and federal law, including but not limited to the MLUL, 42 USC §1983, and affordable housing laws, to the detriment of Plaintiff, and in frustration of the Application.

74.     In point of fact, the Board, despite the fact that it was imposing a cost generative requirement in contravention of the affordable housing laws, also refused to grant a design waiver from the requirement that the Facility, as an assisted living, memory care, and congregate care facility, provide an EMT-staffed ambulance and ambulance service on a 24/7 basis, it simply pushed off the decision and asserted in the Resolution that it need not address the same as it denied the application for other reasons.

75.     The obvious intent of that decision was that the Board wanted to keep the illegal cost

15

generative ordinance in effect without waiver, so that it would not create any precedent in any fashion and could be used to discriminate against similarly situated applicants in the future, including the Plaintiff, if the Court were to remand this application back to this very unfair and biased board.

76.     The Ambulance Ordinance is, therefore, invalid, arbitrary, capricious, and unreasonable, void, ultra vires and of no force and effect.

**C. <u>The Application</u>**

I.     *Background and Description of Property*

77.     The Application sought the approval of an assisted living, memory care and congregate care facility which is an inherently beneficial use.

78.     There is a need for assisted living, memory care, and congregate care facilities in Closter, New Jersey as exemplified by the expert testimony from Plaintiff's witnesses including, but not limited to the testimony from (i) Bryon Choron (an expert in the field of market analysis and unmet need for senior living); (ii) Janet Meyer (an expert in the field of architecture particularly with respect to the needs of congregate care, assisted living and memory care facilities) who testified as to the amenities proposed and why they are necessary and appropriate for the Facility, to accommodate the needs of the elderly and disabled; and (iii) Kelly Andress (an assisted living facility operator) who testified to the proposed amenities and the need for same; and (iv) engineers from Stonefield Engineering who testified as to residential site plan issues.

79.     In the Borough, there are no assisted living, memory care, congregate care facilities and only limited such facilities in the surrounding communities.

80.     Plaintiff sought approval for such a facility at the Property, which is located in the Borough's District No. 5, Industrial Zone (the "<u>**Industrial Zone**</u>"), immediately adjacent to residentially and commercially zoned districts.

81.     The Property is approximately 6 acres in size and is currently developed with a hodge-podge of six (6) obsolete, unattractive industrial buildings (the largest of which is made of corrugated steel) totaling approximately 60,800 square feet with outside storage, overhead gasolines and is surrounding by large scale commercial and industrial buildings with similar sized footprints as the footprint of the Facility proposed.

82.     The Property is irregularly shaped, has approximately 380 feet of frontage on Herbert Avenue and is over 600 feet deep, with the northeast corner having frontage on Reuten Drive, a cul-de-sac located within an industrial park.

83.     The area surrounding the Property is comprised of a mix of industrial, commercial and residential uses.

84.     The Property itself is located in an Industrial Park and wholly contained in the District No. 5 – Industrial Area zone, which can accommodate, as a matter of right, industrial buildings up to 90,000 square feet in size.

85.     That same Industrial Zone continues behind the Property to the west, and also northwest and to the southwest.

86.     To the immediate west of the Property (across Herbert Avenue) is a large commercial daycare school which is located in the District No.2 – Residence Area B zone.  That zone continues along the frontage of Herbert Avenue for approximately 1200 feet, where it returns to the District No. 5 - Industrial Area Zone on the western side of Herbert Avenue to its terminus, while the eastern side of Herbert Avenue remains in the District No. 2 – Residence Area B zone to the north to its terminus. It is noteworthy that the residential properties in this area on Herbert Avenue back up to industrial property and there is a pocket of some residential houses that are surrounded on all sides by industrial properties.

87.     There are numerous commercial uses within line of site from the Property and an industrial building in excess of 300 feet in length to the north that is constructed right up to the sidewalk

17

abutting Herbert Avenue (approximately 13 feet from Herbert Avenue) and a daycare school directly across the street from the project site that has building length of approximately 145 feet, just 44 feet set back off of Herbert Avenue A hodgepodge of commercial uses continues north within these zones.

88.     To the south down both sides of Herbert Avenue is the District No. 3 (and 3A) – Business Area zone which consists of almost exclusive commercial buildings and uses of various sizes.

89.     The District No. 5 Industrial Area in which the Property is located, is also subject to Affordable Housing Overlay zoning that resulted from the Borough's affordable housing settlement entered into in the declaratory judgment action filed pursuant to *In the Matter of the Adoption of N.J.A.C. 5:96 and 5:97 by the Council on Affordable Housing,* 221 N.J. 1 (2015), applicable to affordable, multi-family rental properties with a maximum density of 10 units per acre for townhomes and 12 units per acre for apartments.

90.     Although not directly applicable to the Application, the overlay zone applicable to the Property provides meaningful guidance as to what the Governing body and Planning Board felt were reasonable bulk standards for apartment building like structures.   This fact was testified to by both the Board's and Plaintiff's planners but was not considered at all by the Board and completely omitted from the Resolution.

91.     Of relevance is the fact that the overlay zone permitted an apartment building thirty (30) feet in height or 2.5 stories in height to be positioned with a thirty-five (35) foot front setback. (more than 15 feet closer than what was ultimately proposed (with one mild exception, to an internal road to the industrial park, that impacts no one and is not visible from Herbert Avenue).

II.     *Description of the Initial Application*

92.     On or about October 20, 2020, Plaintiff filed its initial application for preliminary and final site plan approval, along with use and bulk variance relief, to develop the Property into an assisted living, memory care, and congregate care living facility, rising four stories in height (approximately 57

18

feet), with 77 assisted living units and 118 age-restricted independent living units, for a total of 195 units with a footprint of 80,320 square feet and a floor area of 249,466 square feet.

93.     The October 20, 2020 application also proposed certain amenities and provided adequate parking, by every unit of measurement.

94.     The Plaintiff's Engineer confirmed that the was sufficient parking in accordance with, not only RSIS and the Borough Code, but in accordance with the testimony of Kelly Andress, who provided testimony based upon her 30+ years' experience in the industry.

95.     The October 20, 2020 application initially requested, pursuant to the MLUL, <u>N.J.S.A.</u> 40:55D-70, nine variances for relief from the Borough's zoning requirements, of which two were "D" variances and the remaining seven were "C" variances. The October 20, 2020 application also sought nine design waivers for relief from the requirements of the Borough's zoning design standards.

                    III.     *The Application is Reduced in Size*

96.     Ultimately, through the course of the Application, the Project was dramatically reduced in scope as follows:

    a.  Floor area square foot reduction of 24% to 189,924 square feet

    b.  Unit count reduction of over 15% to 165 units

    c.  Number of stories reduced to two stories at 30 feet in height, with a limited third story of 38 feet in height (which was reduced by 50% in size and is only located on the far rear of the Facility (263' back) and not visible from Herbert Avenue).

    d.  Height max reduction of 33% from 57 feet to 38.33 feet.

97.     As revised, the proposal would provide 165 units, consisting of 88 independent living units, 52 assisted living units, and 25 memory care units for individuals suffering from Alzheimer's disease or other forms of dementia with a footprint of 73,259 square feet, along with 131 parking spaces ("**Application**") in the Borough's District No. 5 - Industrial zone, adjacent to one of the

Borough's residential neighborhoods  (the "**Facility**").

98.    The revised Application ultimately reduced the requested relief to:

a. "D" variances – Three  (use, height, and Floor Area Ratio)

b. "C" Variances – Seven (all of which related to requirements to accommodate the more intensive use of industrial uses and were subsumed by operation of law)

c. Design Waivers – Six (all but one relating to industrial standards like wider curb cuts and radii to address tractor trailers and were subsumed by operation of law)

99.    Ultimately, 27 hearings were held by the Board over a three year period on March 31, 2021, June 10, 2021, July 15, 2021, September 9, 2021, November 29, 2021, February 3, 2022, March 28, 2022, May 3, 2022, May 12, 2022, June 23, 2022, July 11, 2022, August 22, 2022, September 29, 2022, October 11, 2022, November 17, 2022, January 9, 2023 (no testimony was taken), February 7, 2023, March 13, 2023, April 24, 2023, May 31, 2023, July 10, 2023, July 26, 2023, September 14, 2023, November 2, 2023, December 11, 2023, January 31, 2024 and February 26, 2024 (which continued into February 27, 2024).

IV.    *Witness Testimony*

100.    Plaintiff's architect, Janet Meyer, AIA ("**Meyer**" or "**Plaintiff's Architect**"), provided expert testimony supporting the request for variances and reasonable accommodation requested, testifying as to variances sought and the need for the relief requested. She testified as to the height of the proposed structure, length of corridors proposed, amenities provided, and number of units proposed, identifying the need and justification for the items as outlined in the Application, as being related to the needs of the elderly and disabled.

101.    In addition to testimony from Ms. Meyer, Plaintiff presented additional witnesses, such as James Johnston, a representative of Metropolis Property Group ("**Johnston**"), who provided testimony as to the minimum number of units needed to make the Facility financially feasible, as well as

amenities, and size of units to be provided, and how those are necessary for the viability of the Facility.

102.     Johnston provided testimony that the amenities provided were necessary to compete with other assisted living facilities, and with respect to the salon amenity, he noted that because the residents would be frail elderly, transporting them to a local salon usually does not occur and, thus, providing such an amenity on site is of importance.

103.      Kelly Andress, an assisted living operator from Sage Senior Living and intended partner with the Plaintiff ("**Andress**"), testified as to the amenities proposed and why they are necessary and appropriate for the Facility, to provide to the needs of the elderly and disabled.

104.     Andress also testified that Plaintiff, as the developer, needed to provide certain amenities for its potential residents and customer base, such as multiple dining rooms, shuttle service, exercise rooms, and a salon, amongst other amenities, which could only be supported by a sufficient number of units, such as the number proposed.

105.     Through these witnesses, the need for the height of the building was explained. It was necessary due to the fact that the length of corridors had to be shortened from that of an ordinary building (which triggered the need for relief) because the residents are frail elderly and disabled and are unable to walk long distances. Shorter corridors are also necessary for faster response times in the positioning of nursing stations.

106.     Meyer testified that she had over 30 years' experience in designing facilities of this nature, and that to accommodate these issues regarding the length of corridors and building height, this design was the most efficient design that she was able to make.

107.     Meyer indicated that the manner in which she designed the Facility was consistent with industry standards and that those standards have changed over time.

108.     Meyer further testified that the types of amenities proposed are necessary because the market dictates having them and that facilities without these amenities were less likely to be

successful.

109.     Plaintiff's demographic expert, Bryon Choron ("**Choron**") confirmed the necessity of the amenities proposed by the Application, in his testimony and report.

110.     Choron was accepted by the Board as an expert in the field of market demand and unmet need for senior living facilities and testified to the need for senior housing in the community, analyzing the demographic makeup of Closter and the surrounding municipalities. Cohron further testified that there was sufficient demand for the proposed Facility and senior housing, as a whole. He further testified as to the proposed layout of the Facility, noting that it was in line with industry standards.

111.     With respect to Meyer, she also had indicated that the number of units was necessary to provide a population base sufficient to meet the socialization needs of the patients as well as to have enough people to participate in the various activities and amenities to provide a sense of community.

112.     Meyer also testified that she could not reduce the pitch of the roof without making the building less aesthetically attractive. She testified that while she could reduce the height of the building and go with a flat roof structure, that would reduce the height of the building, but still not remove the need for a height variance.

113.     Meyer testified that despite the fact that she could reduce the height of the building with a flat roof structure, that the optics of a flat roof structure even at the lower height would make the building appear more imposing and taller than the larger building with a pitched roof actually was, and she provided exhibits confirming the same. This information was completely omitted from the Resolution or discussion which demonstrates the fact that the Defendants had no interest in delineating proposed conditions upon which an approval could be granted.

114.     Meyer provided additional testimony that she could not reduce the ceiling height

without compromising the impact of the same. She testified that the first floor consisted of larger meeting rooms and activity rooms which requires a taller ceiling to remove the sense of being "closed in" and that the higher floors needed the required ceiling heights to maintain the industry norm.

115.    Andress, a thirty-year operator of facilities, as well as Meyer (an architect with over 30 years' experience in the industry; member of various associations focusing on the industry of assisted living, memory care, and congregate care; and frequent panelist in seminars on the subject), who was accepted by the Board as an expert not only in architecture but the needs of the residents in assisted living, memory care, and congregate care facilities, also attested to the need of socialization and sense of community for residents of the Facility and provided testimony that individuals in these facilities need certain socialization activities as well as amenities on site, because they are not mobile enough to travel to places, such as a beauty salon, restaurant, and to certain medical providers.

116.    Plaintiff's Professional Planner, Joseph Burgis ("**Burgis**" or "**Plaintiff's Planner**"), was qualified as an expert in the field of professional planning and testified as to how and why all of the necessary standards were satisfied.

117.    Burgis provided testimony as to the inapplicability of the bulk standards contained in the zoning code relative to the Property as they were designed for other purposes, not assisted living, memory care, or congregate care living.

118.    Burgis testified that in accordance with law, what would otherwise be considered C variances and/or design waivers, are subsumed in the D1 variance and its analysis; as such, individual considerations of C variances and design waivers is not warranted.  The Board's planner and Attorney agreed with the same.

119.    Despite Burgis and the Board's Planner and Attorney agreeing on the legal

standard, the ZBA Defendants spent considerable time discussing the number of C variances and repeatedly referenced the C variances and design standard relief that was requested for this Application separately, thus, incorrectly considering the number of C variances and design standard waivers that would be considered in other applications regarding the same.

120.    Mr. Burgis testified that despite the fact that the bulk standards for the zone in which the Property was located were inapplicable (due to the fact that they were designed to regulate a much more intensive use), the overlay zoning for the affordable housing, was nonetheless relevant due to the fact that it encapsulated provisions relative to apartment buildings that the Governing Body and the Planning Board thought were reasonable for this particular site. The Board spent no time considering this testimony (which was not rebutted) and the Resolution failed to consider it at all and in fact took said testimony out of the context, to Plaintiff's detriment.

121.    Mr. Burgis provided further testimony that since an apartment building for affordable housing was permitted to achieve the height of 30 feet, with just a 35-foot setback, that the Facility in question at 30 feet in height with over a 50-foot front setback could not be found to be a substantial detriment to the neighborhood or zoning scheme, as a result. Again, something omitted from the Resolution.

122.    Burgis further testified, while there would be less than a 50-foot setback regarding an internal road to the corporate park, located behind the Facility, it did not impact any residents and was not visible from Herbert Avenue.  The less-than-50-foot setback only occurs because a cul-de-sac was removed from the Property, which results in the Property having two front yards, in a literal reading of the Code.

123.    Burgis testified that the proposed Facility exceeded side yard setbacks, provided less impact to open space, cast no shadows, and did not adversely impact neighboring properties. He also found that the building was sufficiently setback so as to provide adequate open space and

24

not create any "Canyon effect". In short, he testified that the size and height of the building created no substantial detriment. Burgis's testimony in this regard was completely uncontroverted.

124.     Burgis indicated that in the <u>Sica</u> analysis, the Board must articulate whatever substantial detrimental impacts it believes are the result of deviating from the Code, and that despite the fact the Board did not give any explanation, the Plaintiff nonetheless substantially reduced the height, size, and scope of the Project.

125.     Burgis further testified as part of the Sica analysis, that there were no articulable substantial detriments, that the traffic generated from the Project was less than that which could be generated by a permitted use as a matter of right, that the height and size of the building did not create any issue that could not be accommodated on Property, and that the building cast no shadow off site nor did it create any sense of overcrowding.

126.     Burgis confirmed that the parking was adequate and that a variance from the floor area ratio, if applicable, and height variance did not create any issues off site.

127.     Burgis testified and the Board Planner agreed that industrial uses (as permitted in the Industrial Zone) are more intensive, noisier, smellier, impactful and less attractive, than the proposed use.

128.     He testified, on balance, the benefits of providing services and housing to the frail elderly and disabled far exceed any perceived detriment and there was no testimony to the contrary.

129.     Burgis confirmed that the 10% Medicaid set-aside for the assisted living and memory care facilities was mandated by Medicare and when deed-restricted, would give the Borough the benefit of affordable housing credits. Burgis further confirmed that the Plaintiff was willing to deed-restrict the balance of the units at a 15% set-aside and that the Borough would get full credit for the same. The Board planner agreed.

130.     Nonetheless, the ZBA Defendants spent a substantial amount of time exploring the

Borough's litigation and settlement agreement, seeking to find a way to suggest that the Plaintiff's Application had some detrimental effect. The Board's consideration of the litigation and settlement agreement was objected to by the Plaintiff but considered regardless.

131.    Burgis confirmed that the affordable housing credit that the Borough would achieve from the proposal was more than double that for which the affordable housing overlay zone was designed to accomplish.

132.    Burgis testified as to both the positive and negative criteria for the D1 variance, noting that the Application was one of an inherently beneficial use and also satisfied the positive criteria for the property being particularly suited for the use proposed, and that the application of the Sica analysis favored granting relief, as the benefit greatly outweighed any substantial detriment, when, in fact, there were none.

133.    Burgis also testified that the positive and negative criteria for the D6 height variance and D4 floor area ratio variance were both satisfied.

134.    Burgis offered testimony regarding the Application, as reduced in scope from the initial submission, testifying that the reduction made the Application considerably consistent with the affordable housing overlay zone for apartment buildings that applied to the Property and while not controlling, those bulk standards were noted by Plaintiff's Planner as being illustrative of what the Governing Body and Planning Board felt were reasonable to regulate residential apartment buildings on site.

135.    Despite the fact that the Board's own Planner agreed that the proposed Facility was substantially similar in appearance to an apartment building (much more than an industrial building that the primary zoning sought to regulate), and much less intensive in use (less traffic and noise with fewer employees), the Board gave such testimony no consideration and it was not even referenced in the Resolution.

136.     Plaintiff's Engineer, Jonathan Istranyi, of Stonefield Engineering ("**Istranyi**" or "**Plaintiff's Engineer**"), was qualified as an expert in the field of engineering and testified regarding the original site plan and all submissions as well as the revisions of the Application and need for various relief.

137.     He also provided testimony regarding stormwater management and confirmed that stormwater runoff rates would be reduced from their existing condition as a result of the proposed project and that the project had an adequate proposed stormwater management system consistent with state regulations.

138.     Through the course of the Application, Istranyi revised the site plan to address the Board's concerns and Plaintiff's concessions.

139.     Plaintiff's Traffic Consultant, Mathew Seckler of Stonefield Engineering ("**Seckler**" or "**Plaintiff's Traffic Consultant**"), was qualified as an expert in the field of traffic engineering.

140.     Mr. Seckler testified that traffic circulation and parking stall size are satisfactory, safe, and did not create any substantial detriments. The Board Engineer did not disagree.

141.     He also testified that the Property could accommodate an approximate 90,000 ft. industrial building as a matter of right with in the District No. 5 Industrial Zone, with all necessary parking and setbacks, and that the traffic generated by such a permitted building would be in excess of the traffic generated by the proposed Application and that the type of traffic generated with the industrial use would consist of tractor-trailers and truck traffic whereas the traffic generated by the assisted living facility would be mostly sedans and passenger vehicles.

142.     As such, there would be no articulable detriment, never mind a substantial detriment in this regard, for the proposed use. Plaintiff's Planner and the Board Planner agreed.

V.      *Defendants' Bias and Wrongful Actions*

143.    The ZBA Defendants acted discriminatorily, arbitrarily and capriciously throughout the hearings and in its deliberations and ultimately in its decision, in numerous ways.

144.    They routinely ignored instructions by their own attorney and insisted on the consideration and deliberation of impermissible and irrelevant factors.

145.    The ZBA Defendants failed to give due consideration to the needs of the aged and disabled and even the needs of the poor. In so doing, they actually failed to ever discuss it during deliberations or in the Sica analysis.

146.    The ZBA Defendants were closed-minded and refused to consider Plaintiff's Application in accordance with case law.

147.    The ZBA Defendants also refused to objectively apply the four-part Sica analysis as well as follow the provisions of State and federal law, and the MLUL.

148.    The ZBA Defendants' improper conduct went even further, by intentionally or inadvertently failing to consider substantial pieces of material and relevant evidence, including but not limited to, the necessity of the proposed dimensions (such as hall length and building height) of and why the relief sought was consistent with the purposes of the MLUL and furthered the goals of the Borough's Master Plan. In fact, the Resolution failed to accurately acknowledge the same and it further failed to acknowledge the Board Planner's agreement on the issue.

149.    However, the ZBA Defendants did not stop there, they regularly and with great frequency considered and discussed at length evidence that was irrelevant and/or improper and did so over Plaintiff's objection, such as Defendant Bianco's opinion of the needs of certain residents based upon their ethnicity and their financial capabilities.

150.    Defendant Bianco interjected his opinion and took the Applicant's time to present against the Application. At times, he spoke to the ethnicity and financial capabilities of Borough

residents in the middle of the Application, disrupting the Application and improperly influencing the Defendant Board. These opinions along with many other factors were outside the purview of what Defendant Board could lawfully consider; the Board's Planner agreed.  Nonetheless, it affected the Board's objectivity and improperly influenced it against the Application.

151.    At another time, in the Application, Chairman Bianco also offered his opinion that Herbert Avenue was too busy for elderly residents but, at the same time, that he wanted the Application to be revised to accommodate tractor trailers that accidentally enter the Facility and need to use the adjacent roadways.

152.    Not only that, Bianco asked the Plaintiff to consider allowing tractor trailer to drive through the site to access the industrial park behind the property in question, but then claimed that somehow this facility was inconsistent with the (non-existent) residential character of the neighborhood.

153.    Bianco voiced objection to moving seniors onto the Property because it was not an acceptable place to live in light of the industrial uses adjacent to it, but after a number objections and a cautionary statement from the Board Attorney that an inherently beneficial use removes that issue form contention, Defendant Bianco then suddenly claimed that the proposed project was going to ruin the character of the residential neighborhood in which it was proposed. Clearly, he acknowledged, by his first comment, that this was not a residential neighborhood, and this is further evidence of his bias.  Again, this was in the form of him giving an opinion in the middle of Plaintiff's witness testimony.

154.    From the beginning and before even the first witness testified, Bianco had an adverse and biased opinion of the Project that he could not suppress.

155.    As stated by Bianco succinctly at the February 7, 2023 hearing: "I've been talking about this ever since you filed the application. From day one I've always said it's too big."

156.    Notwithstanding this articulated opinion and contrary to their obligations under Sica, the ZBA Defendants never articulated proper and perceived detriments caused by the Project, whether it be due to its use, its size, or otherwise.

157.    In fact, the ZBA Defendants continued to fail to articulate any detriment after Plaintiff repeatedly had asked the Board to do so over the course of at least two hearings.

158.    Upon information and belief, the ZBA Defendants failure to articulate any detriment was done intentionally in order to prevent the Plaintiff from suggesting modifications to the plans to address the same.

159.    Throughout this period of time it is also noteworthy that not once did the Board indicate what an acceptable height, what an acceptable square footage, or what an acceptable number of units that it would be.

160.    That is because the Board only concerned itself with the deviations from the numerical values in question and not the impact of those deviations (which they were required to do).

161.    During deliberations, the Board Attorney even encouraged the members of Defendant Board to openly deliberate and express their thought process, at the time that they began to perform the Sica analysis. He indicated that he is looking for the "because" behind the statement that the Project is a detriment to the public good or community.

162.    However, in so doing, members of the Board only discussed improper factors of consideration, such as (i) whether the height variance may establish precedent and cause a domino effect on adjacent properties or other properties in the community; (ii) that the building is too big; (iii) that the need for such communities is accommodated in neighboring communities (despite the fact that all evidence was to the contrary and this was not a valid consideration for a decision); (iv) relying upon the Board members' unsubstantiated belief as to the vacancies in similar communities

when all evidence is pointing to demand for these facilities, greatly exceeding the need; (v) considering the cost of the Facility to proposed residents and comparing that cost to what some perceived as "cheaper" options elsewhere, which comparison was not based on any evidence in the record; (vi) considerations over the types of people who would be accommodated in the proposed Facility; (vii) failed to explain what the character of the neighborhood was, where the Facility would be located and how the Project would impact the same and alter the same; (viii) conflated the Master plan with the most recent 2019 re-examination report, among other inappropriate considerations.

163.    Furthermore, nowhere during the deliberations did the Board members consider restrictions they could impose upon the Project to mitigate their concerns (albeit improper concerns). The ZBA Defendants' intent was to deny this Application and not impose conditions for it to work or be acceptable.

164.    Furthermore, the Board not only failed to identify and quantify the detriments of the Project but failed to identify and quantify the benefits of the project and failed to balance the detriments against the benefits. The deliberation process that occurred is not reflected in the Resolution, which fabricates what the Board considered and the process in which it engaged.

165.    Ironically, almost all of the factors listed above and discussed at the time of <u>Sica</u> deliberations were disputed by the Board Attorney, as being improper considerations.

166.    Even after the Board Attorney tried to put words into the mouths of various Board members, they spit those words out and returned to considering the very same improper factors they would use as the basis of their decision which was ultimately arbitrary and capricious due to the same.

167.    Further demonstrating Defendants' bad faith is the contention in the Resolution that Plaintiff's architect, Meyer, was not qualified to give testimony on the needs of the people for which she designed the facility. While such a conclusion runs in the face of common sense, it runs contrary

to the Defendant Board's own action, when they accepted Meyer and acknowledge that she was an expert in architecture, with a focus on the needs and requirements of congregate care, assisted living in memory care facilities and they never raised this issue on the record, either during the hearing or during deliberations. This was just added by the Board Attorney and done in bad faith.

168.    Moreover, despite ample testimony demonstrating the need for this Facility, and argument provided by Plaintiff's counsel that the demonstration of need is not a requisite element of establishing inherently beneficial use (Homes of Hope, Inc. v. Eastampton Twp. Land Use Plan. Bd., 409 N.J. Super. 330 (App.Div. 2009)), the Board ignored those considerations and seemingly sided with the Defendant Bianco and Noard Member Brunell's fortuitous unsolicited and non-evidential comments on the record (against the testimony from professionals such as Meyer, Andress, Johnston, and Istranyi), and made need a primary consideration of their decision even though it was not articulated in the Resolution.

### a.    Defendants' Delay Tactics

169.    Throughout the 27th hearings, the ZBA defendants led by Defendant Bianco intentionally and needlessly delayed the proceedings in a variety of ways.

170.    For example, at the 2nd to last hearing, which was intended to be the last hearing of the Application, Defendant Bianco required the Plaintiff to run through a list of over 130 requests that were not made only by the Board during the Application process, but included requests made by the Borough's Planning Department before the Application was deemed complete.

171.    Clearly the requests made by the Planning Department must've been satisfied before the first hearing on the Application occurred and Defendant Bianco was aware of that, but nonetheless tried to insist on spending time going through the same.

172.    This request also required the Plaintiff and Board Attorney to spend hours running through each and every request made by the Board or any of its members or professionals from the

very first hearing 3 years earlier, despite the fact that over 100 of related to plans and requests that were no longer part of the Application.

173.    Upon information and belief, Defendant Bianco only engaged in this activity due to the fact that he wanted to encourage members of the public to come and speak out against the application who are not there that evening and delaying the application would afford an opportunity to reach out to these people and ensure their attendance. One such person was a member of the public, Steve E. Cruz ("**Cruz**") who had never appeared at any of the Plaintiff's hearings before the last hearing and upon cross-examination acknowledged that he communicated with the Chairman regarding the same and spoke to him at Republican club meetings where the application was also discussed.

174.    To the extent that the exercise engaged in at that 2nd to last hearing had any merit at all, it should have been discussed among counsel before the hearing, as is normally the case.

175.    Another glaring example is that the Plaintiff wished to introduce conceptual plans which showed a reduction in size of the project and the proposed Facility, but the Chairman refused to allow the Plaintiff to do so and insisted that the original plans be fully testified to by the Plaintiff's experts, despite the fact that the scope of the project was going to be reduced in size and scope.

176.    More specifically, At the July 11, 2022 hearing, Plaintiff Engineer, Istranyi, attempted to discuss the revised plans, but Bianco improperly rejected the attempts to do so, stating that he "wanted to see the impact of the original proposal", before considering an alternative. Bianco's biassed conduct frustrated and delayed the Application since Plaintiff should have been permitted to present a revised, reduced application for consideration at that time (instead of having to wait until a later date to do so).

177.    The Board, its professionals (including its Planner and Attorney), as well as members of the public, all attempted to question Istranyi on the revised concept plans, with Bianco rejecting

their attempts to do so and, instead, insisting that they continue to consider the original application.

178.    Bianco went so far as to disagree with the Board Attorney who tried to question suggested they consider the revised application, with Bianco stating **"I keep saying to everybody, we're not there yet. I want to know where we are before we start doing what we're going to do."** Demonstrating the Chairman's lack of candor and honesty, he later denied making these comments in an attempt to hide his bad faith and mislead the Defendant Board and public.

179.    The Chairman's efforts were clearly done to frustrate Plaintiff's Application and to delay the proceedings, and increasing the Plaintiff's expenses, as there was no merit to running through the plans of a larger project, than the Plaintiff was then seeking, but to garner bad feelings from the Defendant Board and public and to compel several days of unnecessary testimony.

180.    The delay caused by this obstructionist behavior was profound.  For example, in a ruse and attempt to turn the Board against Plaintiff and its Application, the Chairman after expressing his strong desire to <u>not</u> hear any alternative concept plan, polled the Board, who unsurprisingly agreed with Bianco.

181.    As if that was not damaging enough, the Chairman repeatedly requested additional clarifications and even modifications on plans that the Plaintiff already advised were being abandoned for a reduced plan.

182.    When confronted, with the irrelevance of such requests, the Chairman pontificated, that the Board needed greater analysis of the former plan to understand the full concession on the reduced plan.  This was a biased act to intentionally try to waste the Plaintiff's time and money.

183.    Even the Board Attorney was confused by Bianco's conduct at the July 11, 2022 meeting, lamenting the fact that the revised plans should have been discussed, but were not being considered by the Board, despite it being permissible for them to do so. Had the ZBA Defendants simply been willing to consider a revised submission earlier, there would not have been a needless

delay in the proceedings (and likely much less than 27 hearings).

184.    This insistence of keeping the original application before the Board and public beyond the period of time that the Plaintiff was offering concessions to reduce the scope and size of the project, was intended to create greater bias from both the Board itself, improperly influence them and the public at large, a bias the Chairman was intentionally facilitating.

185.    In another example, at one time the Plaintiff attempted to streamline the process and bifurcate the Application so that the determination of use could be independently determined and, despite the fact that the Chairman said in 2019, that bifurcation could be pursued, he opposed the request at the hearing and influenced the Board to vote against that process, in a further attempt to harm Plaintiff, by inferring that the Plaintiff was trying to hide something and delay and frustrate the Application. This information was deliberately omitted from the Resolution to conceal the blatant bias of the ZBA Defendants.

186.    Bianco further unnecessarily delayed the Application when he directed the Board Planner to create a table comprised of data of assisted living facilities in neighboring communities to compare their sizes and scope to the Project, such as height, size, number of units, number of floors, and size of lot. The Plaintiff objected to the same, as those considerations do not fall within the analysis provided for a D1 use variance regardless of whether the relief requested was for an inherently beneficial use or other special reasons.  Notwithstanding the same, Defendant Bianco insisted that the Planner, at Plaintiff's expense create that chart, which she ultimately submitted, (Exhibit BD-13), dated March 10, 2023

187.    That chart was misleading and contained a significant amount of inaccurate information, which was pointed out during cross-examination by Plaintiff's counsel and acknowledged and admitted to by the Board Planner.

188.    Through cross examination, Plaintiff's counsel got the Board Planner to admit that

with the correct information, that table depicted that the average of all the other facilities showed they had a greater number of units than proposed on the Plaintiff's Application and more floor levels but with less acreage than the Plaintiff's Application.

189.    Unhappy with the Board Planner's admission, Defendant Bianco asked the Board Planner to reconfigure the data in a fashion that he felt was more detrimental to the Plaintiff's Application.

190.    The Plaintiff again objected to Defendant Bianco's request to have the Board Planner reconfigure her submission.

191.    The Plaintiff further objected to expending additional money for the Board Planner to effectively work against Plaintiff's Application.

192.    Over the Plaintiff's objection, the ZBA defendants insisted that the Board Planner redraft the table which was ultimately done. All in all, almost one hearing was devoted to considerations of this table which was wholly irrelevant and unduly influence the Board against the Plaintiff's application.

193.    Upon information and belief, all of these aforementioned actions were expended in an effort to frustrate and delay Plaintiff's Application, to cause the Plaintiff financial harm, to unduly influence the Board against the Application, and to further discriminate against the aged, infirm, and/or disabled.

### b.    Misleading Questions/Statements

194.    In furtherance of Bianco's and Defendant Board's bias and disparate treatment of Plaintiff and the aged, infirm, and/or disabled, Bianco asked leading questions based upon misinformation to Plaintiff's witnesses, in an attempt to lead Plaintiff's professionals astray or to establish a record contrary to their testimony and evidence in the record.

195.    As an example, Chairman Bianco repeatedly mischaracterized the Herbert Avenue

area as being a "residential area" despite testimony from the Board's own Planner and Plaintiff's Planner that the area was mixed industrial, commercial, and residential and that the Property itself was zoned industrial. There are other instances of similar conduct.

196.    Despite all that, his questions were repeatedly misleading in an attempt to establish his own record contrary to all of the evidence.

197.    Even after objection, the Chair insisted on still loading his leading question with this misinformation.

198.    Interestingly both of the planners' testimonies on this issue and Plaintiff's counsel's objections to these inappropriate questions are conspicuously omitted from the Resolution.

199.    Bianco's bias towards Plaintiff, the Application, and handicapped and/or disabled persons permeated the Board and its decision-making process, as evidenced in the transcripts of the hearings, which are incorporated herein by reference.

c.    **Improper Considerations and Discounting of Evidence**

200.    The Board improperly considered the ethnicity of the residents of Closter and the surrounding communities, during the March 28, 2022 hearing going so far as to referring to the "Asian" community as a whole and their purported tendencies. This consideration was reflected in the Resolution. While this was part of the Defendant Board considerations, no reference to it was in the Resolution, to whitewash their error.

201.    Despite being cited supportive case law to the contrary, the Chairman repeatedly considered and at length discussed the need and demand for the facility and the financial position and capacity of the potential residents. While this unduly influenced the Board's decision and was part of the Defendant Board's decision, it was not referenced in the Resolution, to whitewash their error.

202.    These factors clearly were used as a basis to deny the Application, and the Resolution

failed to reference the same in an attempt to erase the ZBA Defendants' discriminatory intent and bad faith.

203.    With respect to the size and scale of the Application, the Board failed to consider (or discounted) the fact that the ceiling heights and hallway lengths were necessary, as were the number of units and amenities offered, as testified to by Plaintiff's Professionals, including Meyer, Andress, Johnston, and Istranyi. Nonetheless, the Board ignored the need for those dimensions by the handicapped and/or disabled residents of the Facility and for a facility to function and be successful, which evidence was conspicuously omitted from the Resolution.

204.    Ironically, despite the fact that the Board accepted Janet Meyer an architect who specializes in designing facilities of the nature proposed as an expert in the "field of architecture particularly with respect to the need and requirements of congregate care, assisted living in memory care facilities" and Kelly Andress, one of Plaintiff's witnesses providing testimony in the field of unmet need and market analysis, the Board in its Resolution for the very first time challenges their expertise to provide testimony on the needs of facilities of the nature proposed! This was done in bad faith, to intentionally prevent any possibility of addressing these alleged creditability determinations.  This is just another deceptive practice engaged in by the Board and its professionals to perpetuate its discriminatory intent and sabotage the application.  In point of fact, no one questioned her credentials in this capacity, and she was accepted by the Board in that capacity.

205.    Notwithstanding the same, not once did the Board question her credentials on the needs of the expected residents, which were also corroborated by the facilities anticipated operator Kelly Andress, the issue was raised for the first time in the Resolution, in a way that violated the Plaintiff's right to due process of law.  The entire Resolution reeks of improper considerations and bad faith.

206.    There was ample and uncontroverted testimony that the size, amenities, and overall

layout of the Facility were necessary to promote functionality and feasibility, such as communal space was needed for socialization, the size of the population (and therefore number of units) was appropriate to promote socialization, and that the selected design standards as to building height and safety, amongst other considerations, were testified to during the 27 hearings.  The Resolution discounted all testimony to that effect, to Plaintiff's detriment.

207.    Similarly, and despite the Board claiming that Cohron's need analysis failed to account for certain things, such as out-migration and the fact that certain persons would use home (or tele) health services in lieu of assisted living, memory care, and/or congregate care services, he testified that his analysis accounted for both of those considerations and his 100+ page report confirmed the same. Cohron added additional testimony as to why he chose a 7-mile polygon, in lieu of a 5-mile polygon, to identify the area of need. The Resolution ignores Cohron's testimony to bolster ZBA Defendants' pretextual position that there was no need for the Facility.

208.    The Board also failed to give due consideration to the uncontradicted testimony and evidence that the Application (as revised) would result in a third story (floor) that was **<u>only</u>** located on the rear of the Facility and **<u>would not</u>** be visible from the roadway at all ( as the two story portion which was permitted in the zone as an apartment building) obstructed its view and that obstruction occurred with a setback that was over 15 foot greater than the Borough's code would have permitted it to be as an apartment building. The Facility would not detrimentally affect the neighborhood.

209.    The Board did not consider testimony by Plaintiff's Planner, Burgis, that the **<u>impact</u>** on the open space, air, and light would actually be **<u>reduced</u>** by the Facility, when compared to the current use of the Property. Burgis testified "You know, we've got increased open space on-site in contrast to the existing condition. We have a shadow study that shows that any shadow that might be created by this additional height doesn't adversely affect surrounding properties." Despite the evidence presented, the Board found in its Resolution for the very first time that the open and space

would not be maintained by the Application.

210.    Noteworthy is the fact that a detailed shadow analysis was done at the encouragement of the Board, which demonstrated irrefutably, that the height and scale of the building cast no shadow on any neighbors' properties and had no impact. The fact that the analysis was significant enough to ask for, but when the fact proved favorable to the Plaintiff was dismissed, is evidence of the ZBA Defendants' bad faith.

211.    This is just more evidence that the height of the building was truly a non-issue, and only raised due to the discriminatory intent and bias of the ZBA Defendants.

### d.    The Board Facilitated Objectors and Welcomed Irrelevant Evidence

212.    Further demonstrating the ZBA Defendants' discriminatory intent and the improper considerations upon which the Board's decision was based, Defendant Bianco encouraged third parties to object to the Application, which they did, to the detriment of Plaintiff.

213.    In a glaring instance, a member of the public, Cruz, who clearly was in conspiracy with the Chairman appeared during the public comment portion. Despite the fact that Cruz supposedly had the master plan in his possession for over a year because of his concern over this Application, the final hearing was the only hearing he attended.  Cruz admitted that he did not see any of the prior hearings, but upon cross examination he confirmed that he was in communication with the Chairman and that the Chairman is a member in the same republican club of which he is a member, where this Application was discussed.

214.    After much coaching and overbearing monologue, the Board Attorney conflated this issue and in so doing coached Cruz to essentially not disclose what was said between he and the Chairman.  However, there is more than a mere inference to support conclusions to the contrary and effective cross examination was prevented by the Board Attorney in furtherance of this discriminatory intent of the Board.

215.     With respect to affordable housing, because the ZBA Defendants improperly focused on the affordable housing settlement agreement with Fair Share Housing Center and did so over the Plaintiff's objection and much debate with the Board Attorney.

216.     The ZBA Defendants ignored the uncontroverted testimony that the Application would result in 26 affordable housing credits for the Borough, but that if the overlay requirements were adhered to, only twelve affordable housing credits would be achievable, thus providing a clear benefit to the Borough.

217.     Not only did the ZBA Defendants improperly focus on the Borough's settlement agreement with Fair Share Housing Center, but they actually instructed the Board Attorney to reach out to Fair Share Housing Center's attorney and ask for its position as to whether the Plaintiff's Application violated the terms of the settlement agreement.  In so doing the ZBA Defendants invited Fair Share Housing Center to object to this Application, over Plaintiff's objection.

218.     Fortunately, Fair Share Housing Center did not appear, but drafted a letter that was provided to the Board members, over Plaintiff's objection.

219.     After continued objection, the Board Attorney gave a halfhearted curative instruction to the Board not to consider the letter, but at that point due to the amount of time spent on the issue (clearly with the intent to delay) and the Chairman's laser focus, the Plaintiff was permanently prejudiced. The attention given to this issue improperly allowed the Board to believe the Borough would be sued for breach of contract, which unduly influenced their decision and could never be cured.

220.     Again, there is no mention in the Resolution to this and the other repeated improper considerations the Chairman dragged out before the Board, that were the real basis of the Board's decision and not the attorney-drafted, whitewashed Resolution.

       e.     **Board misapplied Law and the <u>Sica</u> Analysis and never identified the substantial detriment**

221.    Each of the different congregate living arrangements in the proposed Facility – the independent living units, the assisted living units, and the memory care units – are inherently beneficial, whether developed individually or concurrently.

222.    At the hearings on the Application for approval of the Facility, Plaintiff presented evidence including but not limited to, testimony of civil engineering, traffic engineering, building architecture, market need and analysis, and expert planning, that conclusively established that the proposed Facility was an inherently beneficial use and otherwise satisfied all applicable criteria of the MLUL for the grant of a use variance, bulk variances, and preliminary and final site plan approval by the Board.

223.    The use variance request for the Facility was and is required to be evaluated pursuant to the Supreme Court decision of Sica v. Twp. of Wall Bd. of Adj., 127 N.J. 152 (1992).

224.    As an inherently beneficial use, the proposed Facility presumptively satisfies the positive criteria of N.J.S.A. 40:55D-70, because it advances the general welfare, no matter where it is located.

225.    Under Sica, the Board was obligated to (i) identify the public interest at stake; (ii) identify the detrimental effects that would ensue from the grant of the variance; (iii) impose reasonable conditions to reduce the detrimental effects of the variance; and (iv) weigh the positive and negative criteria to determine whether the variance would cause a substantial detriment to the public good and a substantial impairment to the intent and purposes of the zone plan and zoning ordinance.

226.    The Board not only failed to properly apply New Jersey law concerning a request for a use variance involving an inherently beneficial use, but it effectively disregarded the Sica analysis in its entirety. Aside from the bias demonstrated by the Board's ignorance of Sica, its failure to properly apply the case law rendered the Board's decision to deny the Application arbitrary,

capricious, and unreasonable.

227.    By way of example, for the <u>Sica</u> analysis and without limitation, the Board improperly considered factors solely applicable to the D6 height variance and D4 floor area ratio variance, in the D1 analysis, such as the height of the Facility.  These factors were irrelevant given that the proposed use was inherently beneficial. Notwithstanding the same, if and when the Board considered the D6 and D4 variances, the evidence demonstrated that the Property was able to accommodate the Project on the size/scale proposed. The Board also compared density requirements of the overlay zone when they should have had no applicability to the Application.

228.    With respect to the "substantial impairment to the zone plan and zoning ordinance" factor of <u>Sica</u>, if a land use board determines that a proposed application for an inherently beneficial use substantially impairs the intent and purpose of the zone plan and zoning ordinance, the land use board **must identify the particular substantial impairment alleged and provide the applicant with a meaningful opportunity to address the alleged substantial impairment**. This was not addressed by the Board in its Resolution.

229.    During the 27 hearings spanning over 3 years, Defendant Board never once identified any articulable substantial impairment to the public welfare and neighborhood that would allegedly occur were the Application to be approved and, thus, never provided Plaintiff with an opportunity to address the alleged substantial impairment.

230.    The only detriment mentioned over and over *ad nauseum* by Defendant Board as to the alleged substantial impairment was that the Facility, as initially proposed, was "too big".

231.    In fact, at the December 2023 hearing, Bianco submitted that the Application "doesn't impact on its neighbors" and instead that he was considering the impact of the neighbors on the proposed Facility, seemingly misapplying the Sica analysis. The Chairman, upon learning that he had misapplied the legal standard, then tried to change his tune to fit the narrative that he

had been belaboring since before the first hearing, that the Project was "too big" and that it would impact the neighbors. This finding was false and the Chair's statements misleading. Moreover, he never identified any purported detriment.

232.    The Plaintiff's attorney explained and told the Board repeatedly, that "too big" is not a detriment and that it needed to articulate what the impact was, in order to give the Plaintiff a chance to mitigate it, however, that is all the Board said.

233.    Even the Board's own attorney advised it repeatedly, that the Defendant Board needed to give the "because" explanation; it never did.

234.    Even after deliberations began and the Board Attorney put forth what he thought were proper explanations, the Board members spit the words out and went back to citing a plethora of improper considerations that were not detriments in the eye of the law, rendering the Sica analysis worthless and the ultimate decision, arbitrary and capricious.

235.    The net result of these improper actions driven by bias, is that the Defendant Board never provided Plaintiff with an opportunity to address the alleged substantial impairment.

236.    Notwithstanding the fact that the Defendant Board gave absolutely no meaningful guidance or any explanation of any detrimental impact it felt was caused by the size of the project, Plaintiff ultimately reduced the scope of the project, as set forth above. As such, Defendant Board did not give the Plaintiff an opportunity to address the same, violated the Plaintiff's Due Process rights, and acted arbitrarily and capriciously.

237.    Not once did the Defendant Board suggest what size project would be acceptable; or suggest changes to floor configuration, FAR, or the number of units that would be acceptable.  From Defendant Board's input it is clear that the only dimensional criteria they would have found acceptable would have been 100% compliance with both the most restrictive residential and most restrictive industrial bulk standards with no consideration at all for the value of the inherently

44

beneficial use.

f.    **The Board Improperly Considered the Density and Volume of the Facility**

238.    Despite the fact that both the Board's Planner and Attorney advised that the issue of density was inapplicable to the Application and/or a determination on the merits thereof and the Plaintiff's attorney objected to the same, various Board members repeatedly raised the issue of density and the Board unavoidably had to consider it, given the magnitude of attention the Chairman and Board members provided it despite the fact that no density requirement is set forth in District No. 5 – Industrial Zone, where the Property is located (and it was not a proper consideration for the Board). Again, this was yet another factor upon which the Board based its decision, and it was not included in the Resolution, as the Resolution was intentionally drafted in a way to conceal the bad faith of the ZBA Defendants.

239.    In so doing, the Board proved that it was ok considering the overlay zoning requirements when the Chairman could "spin" it to the detriment of the Plaintiff, but not for comparable analysis or guidance which both the Board's Planner and Plaintiff's Planner agreed as to the usefulness thereof.

240.    Similarly, the ZBA Defendants repeatedly focused and raised issue with the volume of the building over objection of the Plaintiff, when no regulating standard existed in the code, as acknowledged by both the Board's and Plaintiff's planners.  Again, this was just one other way that the Chairman, with discriminatory intent and bias, attempted to paint the Application as seeming inappropriate.

241.    Plaintiff's Planner testified that neither the Code, Master Plan, or Site Plan Ordinance include a standard or control for volume, which testimony was corroborated by the Board's Planner, who agreed that there was no Code provision that regulates volume. Despite this uncontroverted testimony, the Board considered the volume of the proposed Facility (seemingly as

a component of the floor area ratio ordinance), to Plaintiff's detriment.

IV.    *The Board Attorney Exceeded His Authority and Committed Error*

242.    Pursuant to N.J.S.A. 40:55D-71, a zoning board may employ legal counsel, to provide **expertise and advice** to the zoning board with respect to legal matters. Plan. Bd. of Borough of Leonia v. Borough Council of Borough of Leonia, 222 N.J. Super. 207 (Law. Div. 1987). However, legal counsel may not opine on substantive matters and/or matters outside the Board Attorney's area of expertise.

243.    The Board Attorney's failure to comport his behavior to that of a neutral referee, by rehabilitating witnesses and cross-examining them in a manner akin to an advocate or objector's attorney and not of a municipal professional, twisting the comments from the Board to craft a pretextual reason to deny the Application, improperly charging the Board as to the height variance analysis, irreparably tainted the proceedings before Defendant Board and prohibiting the Plaintiff from objecting to the testimony of witnesses.

244.    For example, at the conclusion of the hearings, during the public comment period, Plaintiff's counsel attempted to object to irrelevant and/or prejudicial comments made by the public, so that they would not be the basis of the Defendant Board deliberations and considerations. However, Defendant Bianco refused to let Plaintiff's Counsel do so instructing him that objections were not appropriate at that juncture.

245.    This was in error, as the public testimony was sworn and evidential. As such, evidence was admitted to the Board without the Plaintiff being permitted to object to same. Plaintiff's Counsel noted the same on the record and, yet, no curative instruction was provided by the Board's Attorney as to what could or could not be considered by the Board with respect to testimony from members of the public, which rendered the decision by the Defendant Board arbitrary and capricious.

         **a.**      **The Board Attorney Cross-Examined Witnesses with Outcome Determinative Bias that Improperly Infiltrated the Board**

246.     In the proceedings at issue the only two people who asked more questions of witnesses than the Board's Attorney were the Plaintiff's attorney and the Chairman of the Defendant Board.

247.     The Board Attorney cross-examined, misled and/or rehabilitated witnesses and twisted the comments from the Board to craft a pretextual, but facially legitimate basis for denying the Application, in the following ways:

       a.      Mischaracterized the testimony of Andress, Plaintiff's witness who testified as to the number of parking spaces necessary for the Facility, amongst other things. The result was a Resolution that incorrectly identified Andress as having testified to 216 parking spaces being required, when she testified that 165 parking spaces were required (only one time mistakenly stating that 216 were required) and then labeled Andress' testimony as "suspicious" in the Resolution, which was false.

       b.      Acknowledged the veracity of Cohron's algorithms and calculations Cohron used to address the need for assisted living, congregate care, and memory care facilities in the surrounding communities, noting that his methods are statistically valid and that other individuals use Cohron's firm quite often. Despite the Board Attorney's comments to the Board, he drafted a resolution that questioned Cohron's model and its findings, and ultimately discounted Cohron's testimony without any valid reason for doing so, to Plaintiff's detriment.

       c.      During deliberations, Board Member Brunell stated that the cost to the residents was a concern of his, a comment that was seemingly supported by Board Member Davida who commented that the Board needed to know who was being served by the Facility

before it could render a decision. In response, the Board Attorney advised them that neither cost nor tax revenue was a valid concern of the Board, but ultimately agreed to disguise their concerns as something less problematic, stating "I understand the concern being addressed and I'm sure that when -- well, let's put it this way, I understand and I'm sure that I can, however this turns out, **I can put words or put thoughts into words** . . . For when a decision is ultimately reached. Put it that way." (emphasis added).

d.     The Board Attorney helped craft a Resolution that for the first time alleged that the Plaintiff's architect, Meyer, who was accepted and qualified as an expert in architecture, with a focus on the needs and requirements of congregate care, assisted living in memory care facilities, was (somehow) not qualified to give testimony on the needs of the people for which she designed the Facility.  Such a conclusion is evidence of bad faith since Meyer had been qualified as an expert during the Application process and no issues were raised as to her qualifications at that time. If the Board Attorney or the ZBA Defendants had questions with regards to Meyer's credentials, they should have asked them during any one of the 27 hearings instead of raising the issue for the first time in the Resolution, which was a clear attempt to hinder Plaintiff's application to its irreparable detriment.

e.     The Resolution falsely claims Cohron's testimony failed to account for persons who were more likely to engage other means of care, such as home healthcare (or telehealth) or the effects of out-migration, "whereby retired seniors move out of high tax jurisdiction locations . . .  in favor of lower tax jurisdictions . . . ." This is an outright lie. Cohron's calculations accounted for people who decide to get home or telehealth services and for those who migrate away from New Jersey. He testified to these facts during a March 2022 hearing date.  Cohron's testimony was not rebutted.

248.   The Board Attorney's cross-examination and rehabilitation of certain witnesses

adverse to the Application, to further the Board's discriminatory intent and conduct, violated the MLUL.

**b.      The Board Attorney Incorrectly Charged the Board**

249.    The Board Attorney furthered the improper considerations of the Board, misleadingly charging the Board in their consideration of the height variance relief requested.

250.    Misconstruing the principles of Grasso v. Spring Lake Heights, 375 N.J.Super. 41 (App.Div. 2004) with respect to the consideration of a height variance, the Board Attorney misinformed the Board as to the law, charging the Board that the proposed development must not offend the purposes of the height restriction and must not be out of character with the neighborhood.

251.    The Board Attorney's charge failed to instruct the Board that under Grasso, whether the proposal is out of character for the neighborhood must be viewed through the context of whether the impact on the purposes of the height restriction is out of character with how those factors exist in the neighborhood. The focus of the analysis is not on the height of the roof of the proposed building when compared to the neighborhood, which is what anyone would have understood the standard to have been, given the charge provided by the Board Attorney. The incorrect charge resulted in the Board misapplying and considering Grasso to the irreparable detriment of Plaintiff.

252.     As a result of Defendant Board's biased, arbitrary, and capricious conduct, it is unclear that any proposal for assisted living, congregate living and/or memory care services would have ever satisfied the Board's arbitrary legal and evidentiary requirements and, thus, the Application and hearings were an exercise in futility.

VII.    *The Board's Improper Denial of the Application*

253.    On February 26, 2024, the Board voted to deny Plaintiff's Application.

254.    On April 17, 2024, the Board adopted a resolution (the "**Resolution**") officially denying the Application.  Notice of the Board's decision was published on April 18, 2024.

49

255.    In addition to all the foregoing issues, which have either improperly influenced the Board or made its actions and decisions improper, as set forth below, the Board acted in bad faith and adopted a sham of a resolution.

### a.        The Board's deliberations were in Bad Faith

256.    During deliberations, the Board repeatedly considered issues that were beyond the scope of their authority and what were appropriate considerations given the relief requested. More specifically, the Board considered the following:

a.        The vacancies of other assisted living, congregate care, and memory care facilities, and the cost thereof, as those do not relate to the variance relief (reasonable accommodations) requested.

b.        The volume of the proposed Facility, as there is no metric or standard in the Code or any other applicable land use ordinance or plan, regulating that factor.

c.        Any purported precedential impacts ("domino effect") that allowing a building of this size and shape would necessarily mean that similarly sized structures would be entitled to variance relief as well, which is simply untrue as each land use application rises or falls on its own merits.

d.        In fact, Chairman Bianco and Board Member Brunnell both expressed this misguided view that somehow approving of the Application would lead to out-of-character development in the Borough.

e.        The ethnicity and (as alleged by Bianco) cultural tendencies of the Asian residents of Closter and the surrounding municipalities, which should have no bearing on whether a municipal zoning board approves of an application to construct an inherently beneficial use (i.e., an assisted living, congregate care, and memory care facility), such as the one proposed.

f.     The cost to residents to live in the Facility, which is not a proper consideration for a land use board, whose authority is limited in addressing the variance (reasonable accommodation) relief requested.

g.     The Settlement Agreement entered into between the Borough and Fair Share Housing Center and the correspondence from the Housing Center regarding the same, which addressed the Borough's affordable housing obligations. Despite the Board Attorney's commentary that the affordable housing agreement was neither entered into evidence nor had it been testified to by any witness, the Board repeatedly discussed the issue during the hearings and the Resolution reflects the Board's consideration of the issue, to Plaintiff's detriment.

h.     The fact that (whether true or not) that residents living in the higher floors of the Facility would have to look at the roofs of industrial structures, which analysis seemingly was meant to concoct a theoretical detriment to the community.

i.     Whether the Property was appropriate for the proposed use, even though the Borough Attorney advised the Board that because an assisted living, congregate care, and memory care facility is an inherently beneficial use, that the Board should not evaluate the Property to determine whether it is appropriate for the use proposed. Such an analysis was superfluous, a waste of time, and detrimental to Plaintiff.

j.     The density of the proposed Facility, claiming that the proposal would result in too many people concentrated int too small of an area., although no density requirement is set forth in District No. 5 – Industrial Zone, where the Property is located (and, thus, this was not a proper consideration for the Board).

k.     The size of the Facility, which Bianco alleged would be the single largest building in the Borough, compared to other buildings in the Borough, to which the Board

Attorney advised that it was not an appropriate consideration for the ZBA Defendants, and that <u>Sica</u> forbid the consideration of such factors. The Board's consideration of the size of the proposed Facility when compared to all other buildings in the municipality was not, therefore, a proper consideration for the Board and which consideration irreparably harmed Plaintiff and violated its due process rights.

257.    Although the Board Attorney instructed the Board as to their inability to consider the factors enumerated in ¶257 and even spoon-fed them pretextual, but facially valid bases upon which to deny the Application, the Board members repeatedly ignored his guidance and returned to their misguided considerations and analysis.

> **b.    The Resolution Mischaracterizes the Evidence and Testimony, Does not Accurately Reflect the Record, and is a Sham**

258.    The Resolution drafted by the Board Attorney is further evidence of the bias and discriminatory intent of the Board and (i) does not accurately reflect the record; (ii)  does not accurately reflect the clear and apparent bias of the Board Chairman and/or the Board, as a whole; (iii) does not accurately reflect the real factors of consideration of the Board in denying the Application; (iv) does not accurately reflect numerous ways the Plaintiff was prejudiced by repeated inappropriate inferences and lengthy discussions of factors that were outside that of which the Board could lawfully consider; (v) takes testimony out of context or only references partial testimony to try and justify a pretextual justification for finding witnesses incredible; and (vi) includes findings of fact not in the record and in some instances never even raised or discussed,

259.     The Resolution, in inaccurately reflecting the Board's actions, was otherwise an attempt to conceal the bad faith of the Board and whitewash its process.

260.    For example, despite the Resolution stating that documentation submitted by Plaintiff and its Professionals was inaccurate and/or misleading (which was false), no mention was

made that the chart prepared by the Board Planner was replete with inaccuracies. This glaring omission was not addressed.

261. Although the Resolution identifies exhibits A-6 through A-10 as somehow misleading, they were not, and the Resolution's finding is pretextual. Those exhibits simply did not contain a scale and were never represented to the Board to have been drawn to scale. Demonstrating the Board's bad faith and discriminatory intent, the Resolution was the first time, **at all,** that the Board alleged that the exhibits were misleading, never having raised the issue during any one of the 27 hearings and, thus, irreparably preventing Plaintiff from being able to address the (purported) issue.

262. The Resolution also claims that Plaintiff's Planner's testimony as to the height of the proposed Facility and whether the height thereof would be consistent with the neighborhood, was not accurate because he misrepresented the height of the dwelling located at 241 Herbert Avenue. The Board concluded that although Plaintiff's Engineer and Planner testified that the property at 241 Herbert Avenue was 40 feet in height, that exhibit A-28 actually identified the property as having a 40-foot setback and not a 40-foot building height.

263. The Board's conclusion as to Burgis's testimony was erroneous because exhibit A-28 identifies 241 Herbert Avenue as having a 43-foot setback and identifies the building as being 2 stories in height. Neither Plaintiff's Planner's nor its Engineer's testimony was inaccurate and, in fact, Istranyi testified that the property was 2 stories in height and between 38 feet and 40 feet in height, which was accurate.

264. Plaintiff's Engineer's and Planner' testimony with respect to the height of the Facility and how it was consistent with the neighborhood was, therefore, uncontroverted and, yet the Board went out of its way to discredit both Burgis and Istranyi and, ultimately, deny the Application.

265.     The Resolution also alleges that Plaintiff presented no evidence as to the level of care required, specific number of units, or the size of what was proposed. This conclusion is factually wrong because there was testimony to that effect, as noted in the preceding paragraphs.

266.     To reiterate, Plaintiff's architect, Ms. Meyer, testified as to the height of the proposed structure, length of corridors proposed, amenities provided, and number of units proposed, identifying the need and justification for the items as outlined in the Application.   Any conclusion that Ms. Meyer failed to present evidence to support her expert conclusions is a fallacy, made in bad faith.

267.     Similar to Ms. Meyer, in response to questions from the Board Attorney, Plaintiff's witness, James Johnston provided testimony as to the minimum number of units needed to make the Facility financially feasible, we well as amenities, and size of units to be provided, and how those are necessary for the Application. Choron, Plaintiff's witness providing testimony in the field of unmet need and market analysis, further testified as to the amenities proposed and why they are necessary and appropriate for the Facility. Accordingly, there was ample testimony as to the necessity of the Application, as proposed, a fact which was conveniently omitted by Defendant Board in its Resolution.

268.     The Resolution states that the Plaintiff's Unmet Need Expert, Cohron, never explained the reason that Plaintiff had used a 7-mile polygon versus a 5-mile polygon to demonstrate need and feasibility of operating the Facility. The Resolution is wrong.

269.     Plaintiff's witness, Cohron was qualified as an expert in the field of market demand and unmet need for senior living and testified that there was no industry standard to use and that, in this instance, a seven-mile polygon was appropriate.  Mr. Cohron continued testifying that it was appropriate to use driving time and, thus, that his analysis using a 7-mile polygon was appropriate in this instance. Due to the fact that natural barriers like rivers impact the area from which residents

are drawn from, that explains why he rightly omitted those facilities located in New York, which may have been within the seven-mile radius but, because of the natural barrier of the Hudson River, were not included.

270.    Mr. Cohron further testified that the communities within 7-mily polygon could support an assisted living, memory care, and congregate care facility, such as that proposed in the Application every year for several years. Thus, there was ample explanation from Cohron on the 7-mile polygon, in direct contravention to the Resolution.

271.    With respect to the affordable housing overlay zone for apartment buildings that applied to the Property, Plaintiff's Planner provided a detailed explanation as to why the overlay zone regulations were nonetheless relevant, despite the fact they were not controlling.

272.    The ZBA Defendants repeatedly mischaracterized the relevance for which the affordable housing apartment building zoning regulations were cited and with bias wrongly claimed that the Plaintiff was bouncing back and forth between zoning regulations and, thus, the Defendant Board refused to consider the same, and this relevant information was omitted from the Resolution.

> **c.**    **The Resolution Does Not Accurately Reflect the Clear and Apparent Bias of the Board Chairman and/or the Board, as a whole**

273.    As more fully set forth at length in this Complaint, the Board, usually by and through the Chair, mischaracterized the testimony of witnesses, ignored uncontroverted testimony by Plaintiff's professionals as to the necessity of the Project, and refused to acquiesce to Plaintiff's attempts to reduce the size of the Project (until much later in time), all in an attempt to frustrate Plaintiff's Application.

274.    The Chair went so far as to engage in a series of delay tactics, making the Board Planner revise a chart, which was unnecessary and had already been testified to and refusing to permit Plaintiff's professionals to answer questions about the revised Application, when revised

concept plans had already been presented and the Plaintiff expressed a desire to revise the Project, to decrease the size thereof. The ZBA Defendants' delay tactics ultimately resulted in the Application spanning 27 hearings, over 3 years, which resulted in a denial.

275.    In addition, the Board attempted to artificially create an issue of lack of credibility of the Plaintiff's professionals, despite the fact that many had been accepted by the Board as experts and that the Resolution often raised credibility issues for the very first time. The Board's failure to identify credibility issues (although Plaintiff maintains they are mere pretext) until the Resolution, prevented Plaintiff from addressing those concerns to its irreparable detriment, which unduly influenced its arbitrary and capricious decision.

276.    The Board's bias was furthered by the actions of the Board Attorney who repeatedly overstepped his role as a neutral party, effectively functioning as another Board member, by aggressively cross-examining witnesses and rehabilitating others, all to further the Board's discriminatory intent and bias towards Plaintiff's Application.

### d.    The Resolution Does Not Accurately Reflect the Real Factors of Consideration of the Board in Denying the Application and Whitewashes the Inappropriate Inferences

277.    As more fully set forth in ¶257, the Board repeatedly considered issues that were not appropriate and which they could not lawfully consider under any of the applicable legal standards, such as Sica, the request for a reasonable accommodation, and height variance relief, amongst others.

278.    For example, the Board considered the anticipated density and volume of the proposed Facility, the ethnicity of the citizens of Closter and the surrounding community, whether the Property could accommodate the proposed use, the Facility costs to potential residents, and the vacancies in other senior living facilities, none of which were proper considerations for the Board.

279.    The Board was limited in the factors and evidence it could consider in analyzing

Plaintiff's request for variance relief (reasonable accommodation). To that end, the Board's failure to confine its consideration of the evidence to that which was applicable, irreparably prejudiced Plaintiff and its Application, rendering the Board's decision arbitrary and capricious.

280.    The Board should have focused on the evidence presented by Plaintiff as to the need and feasibility of the Project, the lack of a substantial detriment that the proposed Facility would have on the community, and testimony the fact that the proposed Facility was not out of character with the surrounding community, amongst other facts. Regardless of the words of the Resolution, which are pretext, none of these factors were considered by the Board.

> **e.**    **The Resolution fails to Document the Plaintiff's claim of Irreparable Prejudice by the Consideration of the Boroughs's Affordable Housing Litigation**

281.    The Resolution states that a January 6, 2023 letter received from the Fair Share housing Center, objecting to the Application, was received but not considered by the Board. This is false.

282.    Despite guidance from the Board Attorney to disregard the January 6, 2023 letter and the Borough's affordable housing settlement as a whole, the Board did just the opposite.

283.    In point of fact, the reasons set forth in the January 6, 2023, letter objecting to the Application and setting forth the reasons as to why the Board should deny the Application, were adopted by the Board (almost *in toto*) in its Resolution.

284.    The Board's consideration of the January 6, 2023 letter and Fair Share Housing Center's objections irreparably prejudiced the Plaintiff and its Application.

285.    Even when the Resolution may have depicted what transpired at a hearing, it whitewashed the discussion, such as augmenting Bianco's comments about the Asian community in 2022 to be merely those about the immigrant population.

**D.  <u>Additional Facts Necessary for the Federal Causes of Action</u>**

I.      *The Code's Regulation and Definition of Nursing Homes Does*
*Not Eliminate The Need For Assisted Living Facilities.*

286.    Although the Code defines and regulates "nursing homes" in certain zones, this does not alleviate the Code's proscription on building assisted living, congregate care, and memory care facilities. Nursing homes and assisted living, memory care, and congregate care facilities are different, and the existence of one does not eliminate the need for the other.

287.    Under New Jersey law, an assisted living facility is one that is "licensed by the Department of Health and Senior Services to provide apartment-style housing and congregate dining and to assure that assisted living services are available when needed . . . ." N.J.A.C. § 8:36-1.3.

288.    Although assisted living facilities provide "a coordinated array of supportive personal and health services, available 24 hours per day, to residents who have been assessed to need these services," such facilities also "promote[] resident self-direction and participation in decisions that emphasize independence, individuality, privacy, dignity, and homelike surroundings." Id.

289.    In that regard, assisted living, memory care, and congregate care facilities are entirely consistent with, and allow handicapped individuals, such as the infirm, disabled, and elderly to enjoy, life in a residence such as those who are not handicapped.

290.    By contrast, "[n]ursing home-level care is provided to individuals who have chronic medical condition(s) resulting in moderate to severe impairments in physical, behavioral, cognitive, and/or psychosocial functioning." Id.

291.    Stated differently, whereas assisted living facility residents may require assistance with activities of daily living ("**ADLs**"), nursing home residents are entirely "dependent [on others for assistance with] several activities of daily living (bathing, dressing, toilet use, transfer, locomotion, bed mobility, and eating)." Id.

292. Notwithstanding the critical need for assisted living, memory care, and congregate care facilities and federal law, the Code not only fails to permit, but by its very language prohibits assisted living, memory care, and congregate care facilities to be erected in any zone in the Borough.

II.    *The Facility Will Provide Necessary Congregate Care.*

293. The New Jersey State Department of Health ("**DOH**") will license and regulate the Facility. For example, New Jersey law requires that a Certificate of Need be issued before any "health care facility [is] constructed or expanded . . . ." N.J.S.A. 26:2H-7. A Certificate of Need will not be issued unless the proposed facility is "necessary to provide required health care" in the area and "can be financially accomplished and maintained. . . ." N.J.A.C. 8:33-1.2(c).

294. On September 21, 2021, the State of New Jersey issued a Certificate of Need for the Facility, confirming that the proposed Facility "can be economically accomplished and maintained . . . ." (the "**Certificate of Need**"). The proposed Facility will substantially comply with the Certificate of Need.

295. The proposed Facility, (initially and as revised), is economically feasible as designed.

296. The Facility can and will provide much-needed residences to handicapped individuals requiring congregate care, memory care, and/or assisted living services.

297. For example, the Facility will provide 165 units, consisting of 88 independent living units, 52 assisted living units, and 25 memory care units for individuals suffering from Alzheimer's disease or other forms of dementia.

298. The Facility will provide for supportive care twenty-four hours a day, seven days a week for its memory care patients, as well as social workers, clinical and family therapists, counselors, and patient support staff.

299. The Facility's focus will be the day-to-day support of its residents, treatment,

rehabilitation, safety and special services for patients suffering from memory loss.

### III.    *Plaintiff's Request for a Reasonable Accommodation.*

300.    Plaintiff sought a reasonable accommodation from the Borough and its zoning regulations by pursuing the Application, which included the variance relief necessary to provide a suitable facility for persons with the disabilities aforesaid.

301.    As reflected in the transcripts and evidence presented, which are incorporated herein by referenced, Plaintiff demonstrated that the requested accommodation was necessary to afford handicapped individuals requiring congregate care, memory care, and/or assisted living services, including John and Jane Does 1-10, an equal opportunity to reside within the Borough.  Id.

302.    In fact, the evidence submitted concerning the need for this Facility was uncontroverted.

### IV.    *The Board of Adjustment Denied Plaintiff a Reasonable Accommodation.*

303.    Ignoring expert testimony, the law, and the uncontroverted evidence presented at the hearings, on February 28, 2024, and based upon the discriminatory intention of the ZBA Defendants, the Board voted to deny the Application.

304.    On April 17, 2024, the Board adopted the Resolution, memorializing its denial of the Application.

305.    The Board's acts and omissions were inappropriate for all the foregoing reasons.

306.    Defendants have provided no legitimate reason for their denial of the Application. No credible evidence was presented at any of the Board's hearings on the Application to challenge Plaintiff's evidentiary submissions, expert testimony, and/or to provide any legitimate reasons for denying Plaintiff a reasonable accommodation.

307.    The lack of credible evidentiary support for the Board's actions makes clear that Defendants' decision was based solely on improper considerations, such as Defendant Bianco's bias

and the unsupported, subjective opinions of the Board members or their repeated questions and expressions of belief regarding factors that they were not permitted by law to consider.

308.   Nevertheless, the Board denied the Application, taking the position that the proposed Facility was a detriment to the public good and public safety.

309.   Although the Board was purportedly concerned about the impact on surrounding residential neighborhoods, the Board gave no consideration whatsoever on the impact on John Does 1- 10, who have no legitimate options to reside in any neighborhoods in the Borough.

310.   In fact, the Board's decision reflects no analysis whatsoever of the critical need for congregate care facilities, affordable housing, and/or senior housing, or what they felt the weight that should be given for the same.

311.   In that regard, the Resolution reflects a clear example of "the familiar conflict between the legal principle of non-discrimination and the political principle of not-in-my-backyard."  New Directions Treatment Serv. v. City of Reading, 490 F.3d 293, 296 (3d Cir.2007).

312.   The Board also offered no evidence to establish that the proposed Facility would: (a) impose an undue financial or administrative burden; (b) impose an undue hardship; or (c) require a fundamental alteration of the Borough's zoning program.

313.   Suffice it to say, the Board denied the Plaintiff the requested reasonable accommodation without providing any explanation as to why the requested accommodation was "unreasonable."

314.   Plaintiff's requested accommodation was necessary to allow handicapped individuals such as a the aged, infirm, and disabled, requiring congregate care, memory care, and/or assisted living services, including John and Jane Does 1-10, to have an equal opportunity to reside in the Borough.

315.    Plaintiff also does not have an adequate remedy at law for the (i) discriminatory Code, (ii) discriminatory zoning decisions, or (iii) improper denial of a reasonable accommodation to Plaintiff, thereby justifying the grant of permanent injunctive relief to allow Plaintiff to construct and operate the Facility, which is economically viable as designed, and which will provide Plaintiff's prospective residents with much-needed support in a congregate care facility, providing memory care, congregate care, and assisted living services.

316.    In addition to injunctive relief and damages, Plaintiff is also entitled to declaratory relief against Defendants pursuant to 28 U.S.C. § 2201, because Defendants' acts and omissions, described above, have created an actual controversy with Plaintiff that is within this Court's jurisdiction.

### FIRST CLAIM FOR RELIEF – AS TO ALL DEFENDANTS
**(Disparate Treatment of the Handicapped in Violation of the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3604(f)(2))**

317.    All preceding paragraphs of the Complaint are incorporated by reference, as if fully set forth herein.

### The Fair Housing Amendments Act

318.    Under the FHAA, it is unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap . . . ." 42 U.S.C. § 3604(f)(2).

319.    Under the FHAA, the term "handicap" means, with respect to a person, a "physical or mental impairment which substantially limits **one** or more of such person's major life activities, . . . a record of having any such impairment, . . . or being regarded as having such an impairment." 42 U.S.C. § 3602(h) (emphasis added).

320.    The FHAA prohibits the imposition of municipal ordinances that have the effect of precluding the development of congregate living arrangements that are necessary for persons with

handicaps to live in a residential setting.

**Assisted Living, Congregate Care, and Memory Care Facilities**

321. Under New Jersey law, assisted living facilities provide "a coordinated array of supportive personal and health services, available 24 hours per day, to residents who have been assessed to need these services including persons who require nursing home level of care." N.J.AC. 8:36-1.3.

322. A typical assisted living, memory care, and congregate care facility resident needs assistance with **two** or more basic daily activities, such as, toileting, bathing, or dressing.

323. Prospective residents of the Facility, therefore, are handicapped within the meaning of the FHAA, which prohibits discrimination against individuals whose disability "limits **one** or more of such person's major life activities . . . ." 42 U.S.C. § 3602(h) (emphasis added).

324. New Jersey law also requires that a Certificate of Need be issued before an assisted living facility "[is] constructed or expanded . . . ." N.J.S.A. 26:2H-7.

325. A Certificate of Need will not be issued unless, amongst other things, the proposed facility "can be financially accomplished and maintained . . . ." N.J.A.C. 8:33-1.2(c).

326. As noted above, the Certificate of Need issued to Plaintiff confirms that the Facility "can be financially accomplished and maintained."

327. Indeed, the Facility can and will provide much-needed residences to handicapped individuals requiring congregate care, memory care, and/or assisted living services.

**The Code**

328. The Code is facially discriminatory in contravention of the FHAA because it applies less favorably to handicapped individuals than to non-handicapped individuals.

329. The Code expressly provides that no building may be constructed unless in conformity with the Code.

63

330.  The Code does not allow assisted living, memory care, and congregate care facilities to be developed as of right or as a conditional use in any zone. As such, if not permitted, the use is prohibited.

331.  The Borough's decision to preclude assisted living, memory care, and congregate care facilities is facially discriminatory because it treats individuals that must live in an assisted living, congregate care, and memory care facility (who qualify as handicapped under the FHAA), differently from non-disabled individuals, who are free to live in the location of their choice.

332.  Defendants have no justification for the Code's disparate treatment of the handicapped.

333.  Defendants' conduct, as aforesaid, was willful, wanton, and intentionally undertaken in bad faith such that it is sufficiently outrageous as to justify the imposition of punitive damages.

334.  Defendant Bianco operated under the color of state law, using his position as Chairman of the Board, with the blessing and knowledge and consent of the Borough of Closter and the Closter Zoning Board of Adjustment to violate the Plaintiff's constitutional rights, and uphold a pattern and practice of the Borough to disparately treat aged, handicapped and disabled individuals, while engaging in the behaviors as set forth above that clearly and unequivocally shock the conscience of acceptable behavior for a member of the Zoning Board of Adjustment.

335.  As set forth above, Bianco's actions were the proximate cause of the deprivation of the Plaintiff's rights.

**WHEREFORE**, Plaintiff demands judgment in its favor and against Defendants and request that the Court grant the following relief:

a.  Permanently enjoining Defendants' enforcement of any provisions contained in the Code against Plaintiff to the extent related to allowed land uses or dimensions in any review of Plaintiff's request for approvals to develop, construct, and operate an assisted living, congregate care, and memory care facility on that certain land located at 231-239 Herbert

Avenue, Closter, New Jersey so long as such requests for approvals are consistent with the plans as revised and  considered by the Board, on February 26, 2024;

b.   Permanently enjoining Defendants from obstructing or interfering with Plaintiff's construction and operation of the Facility;

c.   Declaring that the Code is facially discriminatory in violation of the  FHAA to the extent it precludes development of assisted living, memory care, and congregate care facilities and, therefore, that the offending provisions of the Code are not enforceable; as well as awarding Plaintiff:

d.   Compensatory damages;

e.   Punitive damages;

f.   Attorneys' fees and costs pursuant to, among other authorities, 42 U.S.C. § 3613; and

g.   Such other and further relief as the Court deems necessary and appropriate.

### SECOND CLAIM FOR RELIEF – AS TO ALL DEFENDANTS
**(Disparate Impact on the Handicapped in Violation of the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3604(f)(2))**

336.  All preceding paragraphs of the Complaint are incorporated by reference, as if fully set forth herein.

337.  In addition to the foregoing, a municipality also violates the FHAA if, among other things, the enforcement of the Code has a greater adverse impact on handicapped individuals than on non-handicapped individuals without any legitimate, non-discriminatory justification (*i.e.*, if the Code has a disparate impact).

338.  Plaintiff has established that the Code has a greater adverse impact on the handicapped than non-handicapped individuals in the Borough, in contravention of the FHAA.

339.  Indeed, enforcement of the Code has the effect of limiting the ability of individuals

requiring congregant care to live in the residence of their choice in the community.

340.  For example, and without limitation, despite the need for congregate care facilities, no assisted living, congregate care, or memory care facility exists in the Borough and a limited, but unsatisfactory amount exists in the surrounding communities.

341.  The lack of development has occurred notwithstanding: (i) there being a general "aging" of the population in the state and a substantial increase in the percentage of elderly that are being diagnosed with dementia or Alzheimer's; and (2) there being almost no available beds at assisted living, congregate care, or memory care facilities within the surrounding communities.

342.  The Code's restrictions have perversely impacted the ability of the handicapped to establish residence in any of the Borough's zones, residential or otherwise.

343.  The Code does not similarly impact non-handicapped individuals, who may establish residence in the Borough.

344.  Moreover, the Code has placed burdens on persons with disabilities (including, *inter alia*, having to apply for conditional use permits or variances, lobby for changes to the Code, attend meetings, and hire attorneys) that do not exist for non-handicapped individuals.

345.  Where, as in this case, disparate impacts are identified, the burden shifts to the Borough to show that it had a legitimate, non-discriminatory reason for enforcing the Code and that no less discriminatory alternatives are available.

346.  Defendants have no legitimate, non-discriminatory reason for the Code and  cannot demonstrate that no less discriminatory alternatives than the Code as currently drafted are available.

347.  Consequently, Defendants have violated and are continuing to violate the FHAA by, *inter alia*, enacting and enforcing the Code notwithstanding its disparate impact on the handicapped.

348.  Defendants' conduct, as aforesaid, was willful, wanton, and intentionally undertaken in bad faith such that it is sufficiently outrageous as to justify the imposition of punitive damages.

349. The ZBA Defendants operated under the color of state law, using their positions on or as the Board, with the blessing and knowledge and consent of the Borough of Closter and the Closter Zoning Board of Adjustment to violate the Plaintiff's constitutional rights, and uphold a pattern and practice of the Borough to disparately treat aged, handicapped and disabled individuals, while engaging in the behaviors as set forth above that clearly and unequivocally shock the conscience of acceptable behavior for a member of the Zoning Board of Adjustment.

350. As set forth above, the ZBA Defendants' actions were the proximate cause of the deprivation of the Plaintiff's rights.

**WHEREFORE**, Plaintiff demands judgment in its favor and against Defendants, and requests that the Court grant the following relief:

a.      Permanently enjoining Defendants' enforcement of any provisions contained in the Code against Plaintiff to the extent related to allowed land uses or dimensions in any review of Plaintiff's request for approvals to develop, construct, and operate an assisted living, congregate care, and memory care facility on that certain land located at 231-239 Herbert Avenue, Closter, New Jersey so long as such requests for approvals are consistent with the plans as revised and considered by the Board, on February 26, 2024;

b.      Permanently enjoining Defendants from obstructing or interfering with Plaintiff's construction and operation of the Facility;

c.      Declaring that the Code is discriminatory as applied to Plaintiff in violation of the FHAA to the extent it precludes development of assisted living, memory care, and congregate care facilities and, therefore, that the offending provisions of the Code are not enforceable; as well as awarding Plaintiff:

d.      Compensatory damages;

e.      Punitive damages;

b.      Attorneys' fees and costs pursuant to, among other authorities, 42 U.S.C.§ 3613; and

c.      Such other and further relief as the Court deems necessary and appropriate.

**THIRD CLAIM FOR RELIEF - AS TO ALL DEFENDANTS**
**(Failure to Provide Reasonable Accommodations in Violation of the Fair**
**Housing Act of 1988, 42 U.S.C. § 3603(f)(3))**

351.   All preceding paragraphs of the Complaint are incorporated by reference, as if fully set forth herein.

352.   In addition to the foregoing, a municipality also violates the FHAA if, among other things, it fails "to make reasonable accommodations" from a discriminatory Code, "when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. 3604(f)(3).

353.   Once a plaintiff establishes that a requested accommodation is necessary, the burden shifts to the defendant to show that the request is unreasonable.

**Denial of Reasonable Accommodations**

354.   Notwithstanding the facially discriminatory Code, on October 20, 2020, Plaintiff submitted the Application seeking reasonable accommodations from the Code's discriminatory provisions and enforcement.

355.   In contravention of the evidentiary record, expert testimony, and the law, and influenced by the extreme bias of Bianco (and the Board as a whole), the Board denied the Application.

356.   Denial of the Application constituted a failure to provide a reasonable accommodation to Plaintiff.

357.   Having been presented with and denied Plaintiff's request for a reasonable accommodation, the burden shifted to Defendants to show why Plaintiff's request was unreasonable.

358.   Defendants, however, provided no legitimate reason for their denial of the Application.

359. Instead, Defendants persisted with their enforcement of the Code, precluding handicapped individuals from residing in the residence of their choice within the Borough.

360. Defendants have violated and are continuing to violate the FHAA by, *inter alia*, refusing to provide a reasonable accommodation to Plaintiff.

361. Defendants' conduct, as aforesaid, was willful, wanton, and intentionally undertaken in bad faith such that it is sufficiently outrageous as to justify the imposition of punitive damages.

362. The ZBA Defendants operated under the color of state law, using their positions on or as the Board, with the blessing and knowledge and consent of the Borough of Closter and the Closter Zoning Board of Adjustment to violate the Plaintiff's constitutional rights, and uphold a pattern and practice of the Borough to disparately treat aged, handicapped and disabled individuals, while engaging in the behaviors as set forth above that clearly and unequivocally shock the conscience of acceptable behavior for a member of the Zoning Board of Adjustment.

363. As set forth above, the ZBA Defendants' actions were the proximate cause of the deprivation of the Plaintiff's rights.

**WHEREFORE**, Plaintiff demands judgment in its favor and against Defendants, and requests that the Court grant the following relief:

a. Permanently enjoining Defendants' enforcement of any provisions contained in the Code against Plaintiff to the extent related to allowed land uses or dimensions in any review of Plaintiff's request for approvals to develop, construct, and operate an assisted living, congregate care, and memory care facility on that certain land located at 231-239 Herbert Avenue, Closter, New Jersey so long as such requests for approvals are consistent with the plans as revised and considered by the Board, on February 26, 2024;

b. Permanently enjoining Defendants from obstructing or interfering with Plaintiff's construction and operation of the Facility;

c.      Declaring the Defendants in violation of the FHAA to the extent they denied Plaintiff a reasonable accommodation, precluding development of assisted living, congregate care, and memory care facilities and, therefore, that the offending provisions of the Code are not enforceable; as well as awarding Plaintiff:

d.      Compensatory damages;

e.      Punitive damages;

f.      Attorneys' fees and costs pursuant to, among other authorities, 42 U.S.C. § 3613; and

g.      Such other and further relief as the Court deems necessary and appropriate.

## FOURTH CLAIM FOR RELIEF - AS TO ALL DEFENDANTS
### (Violation of Title II of the ADA, 42 U.S.C. § 12101 *et seq.*)

364.    All preceding paragraphs of the Complaint are incorporated by reference, as if fully set forth herein.

365.    The American with Disabilities Act provides that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the service, program, or activity of a public entity or be subjected to discrimination by any such entity.

366.    The ADA makes it unlawful for a public entity, in determining the site or location of a facility, to make selections that have the purpose or effect of excluding individuals with disabilities from, denying them the benefits of, or otherwise subjecting them to discrimination, including the right to receive care in a residential area.  28 C.F.R. § 35.130(b)(4).

367.    Plaintiff's anticipated residents are qualified persons under the ADA with disabilities that substantially impair one or more major life activities.

368.    Plaintiff's anticipated residents are "qualified persons with disabilities" within the meaning of the ADA, 42 U.S.C. § 12102(2), and 28 C.F.R. § 35.104.

369.  Plaintiff has taken several concrete steps to develop and open the Facility, and fully intend to do so as soon as possible, thereby imminently establishing relationships and otherwise associating with qualified persons with disabilities, including John and Jane Does 1- 10.

370.  More specifically, the Facility will have 165 units, 25 such units are dedicated for use by individuals with Alzheimer's disease and/or other forms of dementia (i.e. memory care), 52 of the remaining units are for use by individuals that are required to live in a congregate care facility as a result of a disability or handicap, while the remaining units are for independent living.

371.  The Borough is a qualifying public entity within the meaning of the ADA.  42 U.S.C. § 12131(1)(A).

372.  The Board is a qualifying public entity within the meaning of the ADA. 42 U.S.C. § 12131(1)(A).

373.  Section 12132 of the ADA constitutes a general prohibition against discrimination on the basis of disability by public entities.

374.  Defendants have violated and are continuing to violate the ADA by, *inter alia*, (i) enforcing the facially discriminatory Code; (ii) taking enforcement actions that result in a disparate impact on the handicapped; (iii) refusing to provide Plaintiff with a reasonable accommodations to disabled individuals; and (iv) generally allowing prejudice against disabled individuals to dictate the outcome of zoning decisions and hearings.

375.  Defendants' conduct, as aforesaid, was willful, wanton, and intentionally undertaken in bad faith such that it is sufficiently outrageous as to justify the imposition of punitive damages.

376.  The ZBA Defendants operated under the color of state law, using their positions on or as the Board, with the blessing and knowledge and consent of the Borough of Closter and the Closter Zoning Board of Adjustment to violate the Plaintiff's constitutional rights, and uphold a pattern and practice of the Borough to disparately treat aged, handicapped and disabled individuals, while

71

engaging in the behaviors as set forth above that clearly and unequivocally shock the conscience of acceptable behavior for a member of the Zoning Board of Adjustment.

377. As set forth above, the ZBA Defendants' actions were the proximate cause of the deprivation of the Plaintiff's rights.

**WHEREFORE**, Plaintiff demands judgment in its favor and against Defendants, and requests that the Court grant the following relief:

a.    Permanently enjoining Defendants' enforcement of any provisions contained in the Code against Plaintiff to the extent related to allowed land uses or dimensions in any review of Plaintiff's request for approvals to develop, construct, and operate an assisted living, congregate care, and memory care facility on that certain land located at 231-239 Herbert Avenue, Closter, New Jersey so long as such requests for approvals are consistent with the plans as revised and considered by the Board, on February 26, 2024;

b.    Permanently enjoining Defendants from obstructing or interfering with Plaintiff's construction and operation of the Facility;

c.    Declaring that the Code is facially discriminatory in violation of the ADA to the extent it precludes development of assisted living, congregate care, and memory care facilities and, therefore, that the offending provisions of the Code are not enforceable; as well as awarding Plaintiff:

d.    Compensatory damages;

e.    Punitive damages;

f.    Attorneys' fees and costs pursuant to, among other authorities, 42 U.S.C. § 3613; and

g.    Such other and further relief as the Court deems necessary and appropriate.

**FIFTH CLAIM FOR RELIEF - AS TO ALL DEFENDANTS**
**(Violation of the Rehabilitation Act of 1973, 29 U.S.C. § 791, *et seq.*)**

378.  All preceding paragraphs of the Complaint are incorporated by reference, as if fully set forth herein.

379.  The Rehabilitation Act provides that no qualified individual with a disability shall, solely by reason of her or his disability, be excluded from participation in or be denied the benefits of or be subjected to discrimination under any program or activity receiving federal financial assistance. 29 U.S.C. § 794(a).

380.  The Borough receives federal financial assistance, including through federal grant programs such as the Community Development Block Grant program, which is funded by the U.S. Department of Housing and Urban Development.

381.  Section 508 of the Rehabilitation Act defines a "program or activity" as "all of the operations" of specific entities, including "a department, agency, special purpose district, or other instrumentality of a State or of a local government." 29 U.S.C. § 794(b)(1)(A).

382.  Zoning decisions by a municipality are normal functions of a governmental entity and thus are covered by the Rehabilitation Act.

383.  Plaintiff has taken several concrete steps to develop and open the Facility, and fully intend to do so as soon as possible, thereby imminently establishing relationships and otherwise associating with qualified persons with disabilities, including John and Jane Does 1- 10.

384.  More specifically, the Facility will have 165 units, 25 such units are dedicated for use by individuals with Alzheimer's disease and/or other forms of dementia, 52 of the remaining units are for use by individuals that are required to live in a congregate care facility as a result of a disability or handicap, while the remaining units are for independent living.

385.  Plaintiff's anticipated residents, including John and Jane Does 1-10, are qualified persons under the Rehabilitation Act with disabilities that substantially impair one or more major life activities.

386. The Borough is a qualifying public entity within the meaning of the Rehabilitation Act.

387. The Board is a qualifying public entity within the meaning of the Rehabilitation Act.

388. Section 508 of the Rehabilitation Act effectuates a general prohibition against discrimination on the basis of disability by public entities.

389. Defendants have violated, and are continuing to violate the Rehabilitation Act by, *inter alia*, (i) enforcing the facially discriminatory Code; (ii) taking enforcement actions that result in a disparate impact on the handicapped; (iii) refusing to provide Plaintiff with a reasonable accommodations to disabled individuals; and (iv) generally allowing prejudice against disabled individuals to dictate the outcome of zoning decisions and hearings.

390. Defendants' conduct, as aforesaid, was willful, wanton, and intentionally undertaken in bad faith such that it is sufficiently outrageous as to justify the imposition of punitive damages.

391. The ZBA Defendants operated under the color of state law, using their position on or as the Board, with the blessing and knowledge and consent of the Borough of Closter and the Closter Zoning Board of Adjustment to violate the Plaintiff's constitutional rights, and uphold a pattern and practice of the Borough to disparately treat aged, handicapped and disabled individuals, while engaging in the behaviors as set forth above that clearly and unequivocally shock the conscience of acceptable behavior for a member of the Zoning Board of Adjustment.

392. As set forth above, the ZBA Defendants' actions were the proximate cause of the deprivation of the Plaintiff's rights.

**WHEREFORE**, Plaintiff demand judgment in its favor and against Defendants, and requests that the Court grant the following relief:

a.      Permanently enjoining Defendants' enforcement of any provisions contained in the Code against Plaintiff to the extent related to allowed land uses or dimensions in any review of

Plaintiff's request for approvals to develop, construct, and operate an assisted living, congregate care, and memory care facility on that certain land located at 231-239 Herbert Avenue, Closter, New Jersey so long as such requests for approvals are consistent with the plans as revised and considered by the Board, on February 26, 2024;

b.      Permanently enjoining Defendants from obstructing or interfering with Plaintiff's construction and operation of the Facility;

c.      Declaring that the Code is facially discriminatory in violation of the Rehabilitation Act to the extent it precludes development of assisted living, congregate care, and memory care facilities and, therefore, that the offending provisions of the Code are not enforceable; as well as awarding Plaintiff:

d.      Compensatory damages;

e.      Punitive damages;

f.      Attorneys' fees and costs pursuant to, among other authorities, 42 U.S.C. § 3613; and

g.      Such other and further relief as the Court deems necessary and appropriate.

### SIXTH CLAIM FOR RELIEF - AS TO ALL DEFENDANTS
**(42 U.S.C. § 1983 – Violation of Equal Protection Rights – Zoning Regulations of the Borough of Closter, Ch. 200)**

393.  All preceding paragraphs of the Complaint are incorporated by reference, as if fully set forth herein.

394.  Defendants' adoption and enforcement of the Code, carried out under color of law, has deprived Plaintiff of its Constitutional right to equal protection of the laws.

395.  The Code improperly discriminates against handicapped citizens requiring congregate care and the facilities which serve to house them, in that it prevents them from residing within the Borough.

396. In that regard, the Code improperly treats disabled individuals differently than nondisabled individuals, who face no such restrictions.

397. Defendants have no legitimate governmental purpose for their divergent treatment of the handicapped and the facilities that treat and house them.

398. Defendants' arbitrary and irrational discrimination against the handicapped violates the Equal Protection Clause of the Fourteenth Amendment of the Constitution.

399. The ZBA Defendants operated under the color of state law, using their position on or as the Board, with the blessing and knowledge and consent of the Borough of Closter and the Closter Zoning Board of Adjustment to violate the Plaintiff's constitutional rights, and uphold a pattern and practice of the Borough to disparately treat aged, handicapped and disabled individuals, while engaging in the behaviors as set forth above that clearly and unequivocally shock the conscience of acceptable behavior for a member of the Zoning Board of Adjustment.

400. As set forth above, the ZBA Defendants' actions were the proximate cause of the deprivation of the Plaintiff's rights.

**WHEREFORE**, Plaintiff demands judgment in its favor and against Defendants, and requests that the Court grant the following relief:

a.     Permanently enjoining Defendants' enforcement of any provisions contained in the Code against Plaintiff to the extent related to allowed land uses or dimensions in any review of Plaintiff's request for approvals to develop, construct, and operate an assisted living, congregate care, and memory care facility on that certain land located at 231-239 Herbert Avenue, Closter, New Jersey so long as such requests for approvals are consistent with the plans as revised and considered by the Board, on February 26, 2024;

b.     Permanently enjoining Defendants from obstructing or interfering with Plaintiff's construction and operation of the Facility;

c.      Declaring that the Code is facially discriminatory in violation of the Equal Protection Clause of the Fourteenth Amendment of the Constitution to the extent it precludes development of assisted living, congregate care, and memory care facilities and, therefore, that the offending provisions of the Code are not enforceable; as well as awarding Plaintiff:

d.      Compensatory damages;

e.      Punitive damages;

f.      Attorneys' fees and costs pursuant to, among other authorities, 42 U.S.C. § 1988; and

g.      Such other and further relief as the Court deems necessary and appropriate.

## SEVENTH CLAIM FOR RELIEF - AS TO ALL DEFENDANTS
### (42 U.S.C. § 1983 – Violation of Equal Protection Rights – Ambulance Ordinance - §173-52F )

401. All preceding paragraphs of the Complaint are incorporated by reference, as if fully set forth herein.

402. Defendants' adoption and enforcement of the Ambulance Ordinance, carried out under color of law, has deprived Plaintiff of its Constitutional right to equal protection of the laws.

403. The Ambulance Ordinance improperly discriminates against handicapped citizens requiring congregate care and the facilities that treat and house them, in that it requires assisted living, congregate care and memory care facilities to maintain on-site 24/7 ambulance/paramedic equipment and staff, whereas able bodied individuals and such other similarly situated individuals have no such requirement.

404. The Ambulance Ordinance also imposes an added cost on the operation of the Facility, by requiring the 24/7 maintenance and operation of ambulance and EMT services, while Defendant Borough provides free ambulance services to neighboring communities.

405. In that regard, the Ambulance Ordinance improperly treats disabled individuals

differently than nondisabled individuals, who face no such restrictions or added requirements.

406.  Defendants have no legitimate governmental purpose for their divergent treatment of the handicapped.

407.  Defendants' arbitrary and irrational discrimination against the handicapped violates the Equal Protection Clause of the Fourteenth Amendment of the Constitution.

408.  The ZBA Defendants operated under the color of state law, using their positions on or as the Board, with the blessing and knowledge and consent of the Borough of Closter and the Closter Zoning Board of Adjustment to violate the Plaintiff's constitutional rights, and uphold a pattern and practice of the Borough to disparately treat aged, handicapped and disabled individuals, while engaging in the behaviors as set forth above that clearly and unequivocally shock the conscience of acceptable behavior for a member of the Zoning Board of Adjustment.

409.  As set forth above, the ZBA Defendants' actions were the proximate cause of the deprivation of the Plaintiff's rights.

**WHEREFORE**, Plaintiff demands judgment in its favor and against Defendants, and requests that the Court grant the following relief:

a.      Permanently enjoining Defendants' enforcement of any provisions contained in the Ambulance Ordinance against Plaintiff to the extent related to allowed land uses or dimensions in any review of Plaintiff's request for approvals to develop, construct, and operate an assisted living, congregate care, and memory care facility on that certain land located at 231-239 Herbert Avenue, Closter, New Jersey so long as such requests for approvals are consistent with the plans as revised and  considered by the Board, on February 26, 2024;

b.      Permanently enjoining Defendants from obstructing or interfering with Plaintiff's construction and operation of the Facility;

c.      Declaring that the Ambulance Ordinance is facially discriminatory in violation of

the Equal Protection Clause of the Fourteenth Amendment of the Constitution to the extent it improperly treats disabled individuals differently than nondisabled individuals, and, therefore, that the offending provisions of the Ambulance Ordinance are not enforceable; as well as awarding Plaintiff:

d.      Voiding the Ambulance Ordinance;

e.      Compensatory damages;

f.      Punitive damages;

g.      Attorneys' fees and costs pursuant to, among other authorities, 42 U.S.C. § 1988; and

h.      Such other and further relief as the Court deems necessary and appropriate.

## EIGHTH CLAIM FOR RELIEF - AS TO ALL DEFENDANTS
### (42 U.S.C. § 1983 – Violation of Due Process – The Board disregarded the Sica Analysis)

410. All preceding paragraphs of the Complaint are incorporated by reference, as if fully set forth herein.

411. Under Sica, for an inherently beneficial use such as the Facility, the Board was obligated to, in part, determine whether granting the use variance would cause a substantial detriment to the public good and a substantial impairment to the intent and purposes of the zone plan and zoning ordinance.

412. The Board improperly applied the Sica test, never identifying the substantial detriment, other than blanketly stating that the proposal was "too big" and, thus, depriving Plaintiff the opportunity to address the alleged substantial impairment.

413. Defendant Board's Sica analysis was defective, effectively meaningless, and deprived the Plaintiff of the right to a fair and impartial hearing, violating Plaintiff's right to Due Process.

414. The ZBA Defendants operated under the color of state law, using their positions on or

as the Board, with the blessing and knowledge and consent of the Borough of Closter and the Closter Zoning Board of Adjustment to violate the Plaintiff's constitutional rights, and uphold a pattern and practice of the Borough to disparately treat aged, handicapped and disabled individuals, while engaging in the behaviors as set forth above that clearly and unequivocally shock the conscience of acceptable behavior for a member of the Zoning Board of Adjustment.

415.  As set forth above, Bianco's actions were the proximate cause of the deprivation of the Plaintiff's rights.

416.  By their actions, as aforesaid, and acting with deliberate and/or conscious indifference to Plaintiff's constitutional rights, the Defendants purposefully discriminated against Plaintiff and violated Plaintiff's right to Due Process under Fourteenth Amendments to the United States Constitution, by depriving Plaintiff of a fair hearing, as guaranteed by law under the Fourteenth Amendment to the United States Constitution.

417.  The consequence of Defendants' actions is that Defendants denied Plaintiff a full and fair hearing on its Zoning Board Application by, inter alia, showing discriminatory animus to the Plaintiff; by negatively prejudging the Plaintiff's Application; and by denying the Plaintiff an impartial decision maker.

418.  As a result, Plaintiff has suffered and will continue to suffer serious financial and reputational damages and damages for which it has no adequate remedy at law.

**WHEREFORE**, Plaintiff demands judgment in its favor and against Defendants, and request that the Court grant the following relief:

a.  Permanently enjoining Defendants' enforcement of any provisions contained in the Code against Plaintiff to the extent related to allowed land uses or dimensions in any review of Plaintiff's request for approvals to develop, construct, and operate an assisted living, congregate care, and memory care facility on that certain land located at 231-239 Herbert Avenue, Closter,

New Jersey so long as such requests for approvals are consistent with the plans as revised and considered by the Board, on February 26, 2024;

b.       Permanently enjoining Defendants from obstructing or interfering with Plaintiff's construction and operation of the Facility;

c.       Compensatory damages;

d.       Punitive damages;

e.       Attorneys' fees and costs pursuant to, among other authorities, 42 U.S.C. § 1988; and

f.       Such other and further relief as the Court deems necessary and appropriate.

**NINTH CLAIM FOR RELIEF – AS TO DEFENDANT THE ZONING BOARD OF ADJUSTMENT**
**(Violation of Municipal Land Use Law, N.J.S.A. 40:55D-1, et seq. –**
**Arbitrary, Capricious, and Unreasonable Decision)**
**(Supplemental Jurisdiction –  via 28 U.S.C. § 1367)**

419.  All preceding paragraphs of the Complaint are incorporated by reference, as if fully set forth herein.

420.  Through the 27 hearings spanning over three years, the Plaintiff presented evidence including but not limited to, testimony of civil engineering, traffic engineering, building architecture, market need analysis, and expert planning, that conclusively established that Plaintiff's Application satisfied all applicable legal standards for an approval under the MLUL and, thus, that the Application should have been approved. The Board's denial of the Application, as expressed in the Resolution, was arbitrary, capricious, and unreasonable.

421.  More specifically, with respect to certain "D" variance relief requested, the Board's discharge of its duties was woefully inadequate procedurally and substantively and, thus, its decisions to deny the "D" variances were arbitrary, capricious, and unreasonable.

422.  The use variance request in the Application is required to be evaluated pursuant to the

Supreme Court decision of <u>Sica v. Twp. of Wall Bd. of Adj.</u>, 127 N.J. 152 (1992). The Board failed to properly apply New Jersey law concerning a request for a use variance involving an inherently beneficial use.

423.  The height variance request in the Application is required to be evaluated pursuant to the New Jersey Appellate Division decision of <u>Grasso v. Spring Lake Heights</u>, 375 N.J.Super. 41 (App.Div. 2004). The Board failed to properly apply New Jersey law concerning a request for a height variance.

424.  Pursuant to <u>N.J.S.A.</u> 40:55D-71, a zoning board may employ legal counsel, to provide expertise and advice to the zoning board with respect to legal matters.

425.  A zoning board may not receive unbridled discretion and opinion from legal counsel (or any professional) for substantive matters and/or matters outside the Board Attorney's area of expertise.

426. Herein, the Board Attorney employed by the Board, consistently interjected his opinion in substantive matters outside the scope of his expertise and effectively acted as another board member or as an advocated against the Application and, in doing so, exceeded his statutory authority and improperly tainting Defendant Board's proceedings, rendering the Board's denial of the Application, arbitrary, capricious, and unreasonable.

427.  The Board's decision to deny the Application is not supported by competent credible evidence in the record.

428.  The Plaintiff submitted, via competent credible evidence, proof that it satisfied all applicable standards and criteria for the requested relief.

429.  Defendant Board failed to suggest or impose reasonable conditions to mitigate any of the substantial detriments they purportedly identified in violation of the <u>Sica</u> decision.

430.  None of the findings set forth in the Resolution justify a denial of the Application or

any of its relief.

431. For the reasons set forth herein and throughout this Complaint, the decision of the Board to deny the Application was arbitrary, capricious, and unreasonable, contrary to the evidence, contrary to the MLUL and applicable case law.

432. As set forth in the preceding paragraphs of this Complaint, the ZBA Defendants are impermissibly biased against Plaintiff and the Application, and they have discriminated against the aged, infirm, and disabled by virtue of their conduct, inclusive of denying the Application. As a result of Defendant Board's and Bianco's bias and conduct, it would be futile to issue a remand, because the bias and discrimination are likely to persist and/or recur. Accordingly, the Court should order reversal, in lieu of a remand.

**WHEREFORE**, Plaintiff demands judgment in its favor and against Defendant Zoning Board of Adjustment of the Borough of Closter, and requests that the Court grant the following relief:

a. Finding that the February 28, 2024 decision and April 17, 2024 Resolution of Defendant Zoning Board of Adjustment of the Borough of Closter are arbitrary, capricious, and unreasonable.

b. (1) Reversing the decision of Defendant Zoning Board of Adjustment of the Borough Closter, dated February 28, 2024 as memorialized in a resolution, dated April 17, 2024, denying Plaintiff Reuten Associates, LP's application for development of the Facility and (2) approving Plaintiff Reuten Associates, LP's application for development of the Facility;

c. Attorneys' fees and cost; and

d. Such other and further relief as the Court deems necessary and appropriate.

**TENTH CLAIM FOR RELIEF – AS TO DEFENDANT BOROUGH OF CLOSTER**
**(Violation of Municipal Land Use Law, N.J.S.A. 40:55D-1, et seq. – Zoning**
**Ordinance is Facially Discriminatory)**

**(Supplemental Jurisdiction – via 28 U.S.C. § 1367)**

433.  All preceding paragraphs of the Complaint are incorporated by reference, as if fully set forth herein.

434.  The Borough is not permitted to discriminate against disabled and/or handicapped persons such as the frail elderly that are prospective residents of the proposed Facility.

435.  The Code is not drawn with reasonable consideration to the character of each zoning district and the peculiar suitability for particular uses such as the proposed assisted living, congregate care, and memory care facility. The Code does not permit the development of congregate living facilities in any of the Borough's zoning districts even though under federal and State law, the Borough is not permitted to deny the prospective residents of the Facility or a comparable housing type, the right to living in a neighborhood on account of their disability.

436.  Although the Code defines and regulates nursing homes in certain zoning districts, no such permission (conditional or otherwise) is provided to congregate living facilities, such as the proposed Facility.

437.  The Code is invalid, arbitrary, capricious, and unreasonable, void, ultra vires and of no force and effect.

**WHEREFORE**, Plaintiff demands judgment in its favor and against Defendant Borough of Closter, and requests that the Court grant the following relief:

a.  Finding that the Borough's Code is unconstitutional, violates the Municipal Land Use Law;

b.  Voiding the Ambulance Ordinance;

c.  Ordering the Borough to exercise its zoning power to permit the Facility on all suitable lots within the Borough's zones;

d.  (1) Reversing the decision of Defendant Zoning Board of Adjustment of the Borough

Closter, dated February 28, 2024 as memorialized in a resolution, dated April 17, 2024, denying

Plaintiff Reuten Associates, LP's application for development of the Facility and (2) approving

Plaintiff Reuten Associates, LP's application for development of the Facility;

    e.  Attorneys' fees and costs;  and

    f.  Such other and further relief as the Court deems necessary and appropriate.

### ELEVENTH CLAIM FOR RELIEF – AS TO DEFENDANTS BOROUGH OF CLOSTER AND THE ZONING BOARD OF ADJUSTMENT
**(Violation of Municipal Land Use Law, <u>N.J.S.A.</u> 40:55D-1, et seq. – Ambulance Ordinance violates uniformity requirements of N.J.S.A. 40:55D-62(a))**
**(Supplemental Jurisdiction –  via 28 U.S.C. § 1367)**

438.  All preceding paragraphs of the Complaint are incorporated by reference, as if fully set forth herein.

439.  Under the Municipal Land Use Law, zoning regulations "shall be uniform throughout each district for each class or kind of buildings or other structure or uses of land, including planned unit development, planned unit residential development and cluster development, but the regulations in one district may differ from those in other districts." <u>N.J.S.A.</u> 40A:55D-62(a).

440.  The Ambulance Ordinance is not uniform because it singles out senior citizens as individuals when living together, who have to arrange for their emergency services to be privately presented, when no other able-bodied persons or individuals living in similar types of facilities are required to do so.

441.  The Ambulance Ordinance does not apply to hospitals, apartment complexes or halfway houses for mentally challenged individuals and, thus, it draws an unreasonable distinction between such facilities and assisted living, congregate care, and memory care facilities.

442.  Because the Ambulance Ordinance draws a distinction between (i) assisted living, congregate care, and memory care facilities and (ii) hospitals, apartment complexes or halfway houses for mentally challenged individuals, the Ambulance Ordinance violates the uniformity

requirements of <u>N.J.S.A.</u> 40A:55D-62(a). <u>Urb. Farms, Inc. v. Borough of Franklin Lakes</u>, 179 N.J.Super. 203 (App.Div. 1981).

443. Defendant Borough's and Defendant Board's adoption and enforcement of the Ambulance Ordinance continues to draw an unreasonable distinction between facilities of the same class and/or kind and assisted living, congregate care, and memory care facilities.

444. The Ambulance Ordinance is facially and as applied to Plaintiff invalid, arbitrary, capricious, and unreasonable, void, ultra vires and of no force and effect.

**WHEREFORE**, Plaintiff demands judgment in its favor and against Defendant Borough of Closter and Defendant Zoning Board of Adjustment, and requests that the Court grant the following relief:

a.   Finding that the Borough's Ambulance Ordinance is unconstitutional and violates the Municipal Land Use Law;

b.   Voiding the Ambulance Ordinance;

c.   Ordering the Borough to exercise its zoning power to permit the Facility on all suitable lots within the Borough's zones;

d.   (1) Reversing the decision of Defendant Zoning Board of Adjustment of the Borough Closter, dated February 28, 2024 as memorialized in a resolution, dated April 17, 2024, denying Plaintiff Reuten Associates, LP's application for development of the Facility and (2) approving Plaintiff Reuten Associates, LP's application for development of the Facility;

e.   Attorneys' fees and costs; and

f.   Such other and further relief as the Court deems necessary and appropriate.

**<u>TWELFTH CLAIM FOR RELIEF – AS TO DEFENDANTS BOROUGH OF CLOSTER AND THE ZONING BOARD OF ADJUSTMENT</u>**
**(Violation of Municipal Land Use Law, N.J.S.A. 40:55D-1, et seq. – Ambulance Ordinance violates the Site Standards Enabling Statute – <u>N.J.S.A.</u> 40:55D-41)**
**(Supplemental Jurisdiction –  via 28 U.S.C. § 1367)**

445.  All preceding paragraphs of the Complaint are incorporated by reference, as if fully set forth herein.

446.  Pursuant to <u>N.J.S.A.</u> 40A:55D-41, municipalities are empowered to establish site design standards for proposed land development.

447.  <u>N.J.S.A.</u> 40A:55D-41 establishes that site standards set forth in a municipality's site plan ordinance shall be limited to standards and requirements relating to <u>only</u> the items (only): (a) Preservation of natural resources on the site; (b) Safe and efficient vehicular and pedestrian circulation, parking and loading; (c) Screening, landscaping and location of structures; (d) Exterior lighting  needed for safety reasons in addition to any requirement for street lighting; (e) Conservation of energy and use of renewable energy sources; and (g) Recycling of designated recyclable materials.

448.  The Ambulance Ordinance regulates the provision of ambulance and EMT services for assisted living, congregate care, and memory care facilities and, thus, relates to none of the enumerated factors set forth in <u>N.J.S.A.</u> 40A:55D-41.

449.  The Ambulance Ordinance was adopted by Defendant Borough and enforced by Defendant Board in violation of <u>N.J.S.A.</u> 40A:55D-41 and is, therefore, invalid, arbitrary, capricious, and unreasonable, void, ultra vires and of no force and effect.

**WHEREFORE**, Plaintiff demands judgment in its favor and against Defendant Borough of Closter, and requests that the Court grant the following relief:

a.  Finding that the Ambulance Ordinance was enacted in violation of <u>N.J.S.A.</u> 40A:55D-41 and is, therefore, invalid, void, and ultra vires, and of no force and effect;

b.  Finding that the Borough's Ambulance Ordinance is arbitrary, capricious, and unreasonable as applied to Plaintiff and the proposed Facility;

c.  Ordering the Borough to exercise its zoning power to permit the Facility on all

suitable lots within the Borough's zones;

    d.  (1) Reversing the decision of Defendant Zoning Board of Adjustment of the Borough Closter, dated February 28, 2024 as memorialized in a resolution, dated April 17, 2024, denying Plaintiff Reuten Associates, LP's application for development of the Facility and (2) approving Plaintiff Reuten Associates, LP's application for development of the Facility;

    e.  Attorneys' fees and costs; and

    f.  Such other and further relief as the Court deems necessary and appropriate.

**THIRTEENTH CLAIM FOR RELIEF – AS TO DEFENDANTS BOROUGH OF CLOSTER AND THE ZONING BOARD OF ADJUSTMENT**
**(Violation of New Jersey Department of Health Regulations, <u>N.J.A.C.</u> 8:40–6.1, et seq. – Ambulance Ordinance is Preempted by New Jersey State Law)**
**(Supplemental Jurisdiction –  via 28 U.S.C. § 1367)**

450.  All preceding paragraphs of the Complaint are incorporated by reference, as if fully set forth herein.

451.  In New Jersey, as set forth in the preceding paragraphs, the DOH regulates assisted living facilities and requires them to obtain a certificate of need and licensure before they can open to operate a facility.

452.  The state licensing standards for assisted living residences, comprehensive personal care homes and assisting living programs found that <u>N.J.A.C.</u> 8:36, et seq., and containing 23 subchapters are comprehensive in scope and require that "[e]mergency medical services shall be available to or arrange for residence requiring the services" <u>N.J.A.C.</u> 8:36–14.1(a). Notably, the licensing regulations do not require an assisted living facility to have emergency transportation services available <u>**on-site**</u>, <u>**24/7**</u>, **"<u>only that they be made available</u>"**.

453.  In addition, the DOH regulates and issues licenses to any entities which seek to operate a basic life support ambulance service (<u>N.J.A.C.</u> 8:40–6.1, et seq.) and has rules addressing the mobility assistance vehicles and basis life support services that are comprehensive (<u>N.J.A.C.</u> 8:40–

1.2(a)).

454.  Under New Jersey State law (Overlook Terrace Management Corp. v. Rent Control Bd. Of West New York, 71 N.J. 451 (1976)), there is a general presumption that state legislation creating a state agency preempts municipal control of that state agency.

455.  A Court considers five factors in determining whether municipal action is preempted: (i) Does the ordinance conflict with the state law, either because of conflicting policies or operational effect, that is, does the ordinance forbid what the Legislature has permitted? (ii) Was the state law intended expressly or impliedly to be exclusive in the field? (iii) Does the subject matter reflect a need for uniformity? (iv) Is the state scheme so pervasive or comprehensive that it precludes coexistence of municipal regulation? (v) Does the ordinance stand as an obstacle to the accomplishment and execution of the full purposes and objectives of the Legislature?

456.  An ordinance will be invalidated if it permits what a statute expressly forbids or forbids what a statute expressly authorizes. Put another way, when the Legislature has preempted a field by comprehensive regulation, a municipal ordinance attempting to regulate the same field is void if the municipal ordinance adversely affects the legislative scheme.

457.  Here, it is clear that the Ambulance Ordinance satisfies all of the Overlook Terrace factors for preemption as follows:

a.  The true impact of the requirement that a basic life support ambulance service be established onsite 24/7 effectively requires an assisted living facility to establish and engage in second, separately regulated health care service, when in fact, the New Jersey Legislature and the DOH do not require them to coexist, as they are separately regulated entities. Furthermore, the requirement that said services be provided onsite 24/7 directly conflicts with the DOH regulations that simply require that an assisted living facility make arrangements for emergency transport.

89

b.   The New Jersey Legislature created the DOH and granted it authority to regulate all New Jersey health care facilities and services, including assisted living facilities (such as the one proposed in the Application) and basic life support ambulance services. In so doing, the New Jersey Legislature clearly intentionally created a comprehensive regulatory scheme implicitly intended to be exclusive of the field and apply throughout the entire State.

c.   New Jersey's regulatory scheme for health care services, in general, and particularly for assisted living facilities and basic life support ambulance services requires uniformity. Unexpected regulatory, operational and/or financial burdens imposed at a local level by a municipality, such as those imposed by Closter here with the Ambulance Ordinance, would place some market participants at a competitive disadvantage to others, creating an imbalance in the market dynamics for health care from one area of the State to another. Furthermore, it is worth repeating that the New Jersey legislature clearly felt the need for uniformity and that is why it created an agency to create one set of rules for the entire State of New Jersey, as opposed to having municipalities regulate the same.

d.   The licensing schemes both for assisted living facilities and basic life support ambulance services, are undeniably persuasive and comprehensive, and preclude the coexistence of the Ambulance Ordinance, which hinders, impairs and impacts the delivery of health care services, Furthermore, the DOH is composed of individuals with the appropriate experience and knowledge to determine what regulations are appropriate (which is exactly why the DOH exists in the first place) and that experience and expertise simply does not exist at the local level, in the Borough (or elsewhere), making the Ambulance Ordinance completely random.

458.   The Ambulance Ordinance is preempted by the DOH licensure regulations, as it directly conflicts with emergency transport services for assisted living facility residents and

infringes upon the plenary authority of the DOH to regulate both assisted living facilities and emergency transport services. Moreover, the legislature clearly has preempted municipal regulation on these issues by the comprehensive health care licensure scheme imposed by the DOH, that it created to enforce and oversee such licenses.

459.   For the forgoing reasons, Ambulance Ordinance is, therefore, void, ultra vires and of no force and effect.

**WHEREFORE**, Plaintiff demands judgment in its favor and against Defendant Borough of Closter and Defendant Zoning Board of Adjustment, and requests that the Court grant the following relief:

a.   Finding that the Borough's Ambulance Ordinance is preempted by New Jersey Department of Health Regulations;

b.   Voiding the Ambulance Ordinance;

c.   Ordering the Borough to exercise its zoning power to permit the Facility on all suitable lots within the Borough's zones;

d.   (1) Reversing the decision of Defendant Zoning Board of Adjustment of the Borough Closter, dated February 28, 2024 as memorialized in a resolution, dated April 17, 2024, denying Plaintiff Reuten Associates, LP's application for development of the Facility and (2) approving Plaintiff Reuten Associates, LP's application for development of the Facility;

e.   Attorneys' fees and costs; and

f.   Such other and further relief as the Court deems necessary and appropriate.

**FOURTEENTH CLAIM FOR RELIEF – AS TO DEFENDANT BOROUGH OF CLOSTER**
**(Fair Housing Act, N.J.S.A. 52:27D-301, et seq. –**
**Midpoint Review Challenge)**
**(Supplemental Jurisdiction –  via 28 U.S.C. § 1367)**

460.   All preceding paragraphs of the Complaint are incorporated by reference, as if fully set forth herein.

461.  The Borough has a constitutional obligation to provide a realistic opportunity for the development of its fair share of the regional need for law and moderate-income housing.

462.  The Borough settled with various parties in its affordable housing declaratory judgment action captioned "In the matter of the Borough of Closter, County of Bergen, Docket No. BER-L-6372-15", including but limited to the Fair Share Housing Center and fixed its third-round affordable housing obligation at approximately 347 units.

463.  Pursuant to the approved settlement, the Court approved, and the parties agreed, the Borough's unmet third round need to be 350 units (comprised of 302 units from the current round of affordable housing and 48 units from the prior round thereof, for a total of 350 units).

464.  Defendant Borough's settlement with Fair Share Housing Center was implemented by way of a Housing Element and Fair Share Plan, adopted in 2018 (the "Plan"), as well as the rezoning of certain districts with an overlay zone to provide a potentially realistic opportunity for the construction of the Borough's 350-unit third round obligation.

465.  The Borough's Housing Element and Fair Share Plan projects that the Borough's unmet need would be satisfied by proposed overlay zoning, a mandatory borough-wide set-aside ordinance, and continuing to collect development fees. The Plan, however, determined that no revisions to the District No. 5 Industrial Area Affordable Housing Overlay District as to the Property, should occur and, thus, they remained the same.

466.  The Borough received a Final Judgment of Compliance and Repose on February 21, 2019 based upon its Housing Element and Fair Share Plan, and implementing ordinances that were adopted between the approval of the settlement and February 21, 2019.

467.  The Borough prepared a mid-point review of its affordable housing settlement on or about June 30, 2020.

468.  The Borough's midpoint review confirms that only 16 units have been constructed

towards satisfaction of the Borough's 350-unit unmet need.

469.   The Fair Housing Act requires that the Court make a substantive evaluation of the compliance mechanism to determine which have proven successful, not successful, or likely will not result in affordable housing.

470.   The purpose of the midpoint review is to determine whether unbuilt sites or unfulfilled mechanisms continue to present a "realistic opportunity" based on information that is to be provided by a municipality.

471.   The Borough's 2020 midpoint review found no evidence to suggest that the Borough's affordable housing compliance mechanisms will result in the production of substantial units in furtherance of the approximately 350-unit unmet need.

472.   The Borough adopted an overlay zone, applicable to the subject Property when affordable, multi-family rental units are being proposed. Upon information and belief, the Application is the only application for land development in the District No. 5 Industrial Area Affordable Housing Overlay District, projected to produce a substantial number of affordable credits.

473.   Of importance, the Application would result in approximately 26 affordable housing credits, in furtherance of the Borough's affordable housing obligations whereas, only 16 affordable housing units have been constructed towards satisfying the Borough's 350-unit unmet need.

474.   The Borough's Housing Element and Fair Share Plan and implementing ordinances, do not create a realistic opportunity for the creation of the Borough's fair share of the regional need for low- and moderate-income housing because there is no expectation that the Borough's unmet need mechanism will produce the requirement units of affordable housing, nor has it been able to do so.

475.   There is not a likelihood that the housing affordable to low- and moderate-income

households contemplated in the Borough's unmet need mechanisms will actually be constructed because incentives included in the Borough's Housing Elements and Fair Share Plan and implementing ordinance are insufficient to create the approximately 350 units of housing needed to meet the Borough's unmet affordable housing demands.

476.  The inclusion of the Property in the Borough's Housing Element and Fair Share Plan concluded that the property is suitable, available, developable, and approvable for development with affordable housing, but Defendants' actions have frustrated Plaintiff's ability to build affordable housing on the Property.

477.  The Property, if developed with the proposed assisted living, congregate care, and memory care Facility, would produce approximately 26 affordable housing credits, in furtherance of satisfying Defendant Borough's affordable housing obligations.

478.  There are no sound planning or environmental considerations that would prevent the development of the Property with an inclusionary development.

**WHEREFORE**, Plaintiff demands judgment in its favor and against Defendant Borough of Closter, and requests that the Court grant the following relief:

a.  Finding that the Borough's affordable housing compliance plan does not create a realistic opportunity for the Borough's fair share of the regional need for low- and moderate-income housing;

b.  Ordering the Borough to prepare a constitutionally compliant plan that creates a realistic opportunity for its fair share of the regional need for low and moderate cost housing;

c.  Attorney's fees and costs; and

d.  Such other and further relief as the Court deems necessary and appropriate.

**FIFTEENTH CLAIM FOR RELIEF – AS TO DEFENDANT BOROUGH OF CLOSTER**
**(Fair Housing Act, <u>N.J.S.A.</u> 52:27D-301, et seq. –**
**Constitutional Compliance Action)**
**(Supplemental Jurisdiction –  via 28 U.S.C. § 1367)**

479.  All preceding paragraphs of the Complaint are incorporated by reference, as if fully set forth herein.

480.  The Borough received a Judgment of Compliance and Repose in its affordable housing declaratory judgment action filed pursuant to <u>In the Matter of the Adoption of N.J.A.C. 5:96 and 5:97 by the Council on Affordable Housing</u>, 22 N.J. 1 (2015)("Mt Laurel IV"), on June 21, 2018.

481.  The <u>Mt. Laurel IV </u>decision states that municipalities that receive a Judgment of Compliance and Repose from the Courts are to be afforded "the judicial equivalent of substantive certification and accompanying protection as provided under the [Fair Housing Act]."

482.  A municipality receiving substantive certification from the council on affordable housing pursuant to its powers set forth in the Fair Housing Act receives a presumption of validity in any constitutional compliance action field after the grant of substantive certification.

483.  The Fair Housing Act does not confer immunity from exclusionary zoning suits.

484.  The Borough is not immune from constitutional compliance actions, but instead its Housing Elementa and Fair Share Plan and implementing ordinances are presumed to provide a realistic opportunity for the provision of the Borough's fair share of law and moderate-income housing.

485.  However, the Borough's Housing Element and Fair Share Plan and implementing ordinances **<u>do not</u>** provide a realistic opportunity for the provision of the Borough's fair share.

486.  Plaintiff is ready, willing and able to construct an inclusionary development, the Facility, on the Property.

**WHEREFORE**, Plaintiff demands judgment in its favor and against Defendant Borough of Closter, and requests that the Court grant the following relief:

a. Finding that the Borough's affordable housing compliance plan does not create a realistic opportunity for the Borough's fair share of the regional need for low- and moderate-income housing;

b. Ordering the Borough to prepare a constitutionally compliant plan that creates a realistic opportunity for its fair share of the regional need for low and moderate cost housing;

c. Ordering the Borough to rezone 231-239 Herbert Avenue for an inclusionary development containing the proposed assisted living, memory care and congregate care facilities, at a density sufficient to permit a total of 165 units of congregate care, assisted living, and memory care services;

d. Attorney's fees and costs; and

e. Such other and further relief as the Court deems necessary and appropriate.

## <u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff Reuten Associates, LP hereby demands a trial by jury as to all issues so triable in this case.


Dated: May 31, 2024

Respectfully Submitted,

SEMERARO & FAHRNEY, LLC

*/s/ Mark J. Semeraro*
Mark J. Semeraro
*155 Route 46, Suite 108*
*Wayne,* New Jersey  07407
973-588-9070
